1  Richard Alexander, Esq. (48432)
   Jeffrey W. Rickard, Esq. (125180)
2  Ryan M. Hagan, Esq. (200850)
   ALEXANDER, HAWES & AUDET, LLP
3  152 North Third Street, Suite 600
   San Jose, CA 95112
4  Telephone: 408.289.1776
   Facsimile: 408.287.1776
5
   Attorneys for Plaintiffs
6

**(ENDORSED)**
# FILED
MAR 2 5 2003

KIRI TORRE
Chief Executive Officer/Clerk
Superior Court of CA County of Santa Clara
BY _____
C. Arapeles
DEPUTY

7

8                    IN THE SUPERIOR COURT OF CALIFORNIA

9                         COUNTY OF SANTA CLARA

10

11  ALBERT AGUILAR,                          )   CASE NO: CV815177
                                             )
12              Plaintiffs,                   )   FIRST AMENDED COMPLAINT FOR:
                                             )
13  vs.                                      )   (1) Negligence
                                             )   (2) Nuisance
14  OLIN CORPORATION, a corporation;         )   (3) Intentional Infliction of Emotional Distress
    STANDARD FUSEE CORPORATION, a            )   (4) Trespass
15  corporation; ORION SAFETY                )   (5) Equitable (Injunctive and/or Declaratory)
    PRODUCTS, a corporation; SANTA           )       Relief and Damages
16  CLARA VALLEY WATER DISTRICT;             )   (6) Punitive Damages
    ANNE LEE; YOSHIO SUEKAWA; and            )   (7) Equitable (Injunctive and/or Declaratory)
17  DOES 1 through 50, inclusive,            )       Relief
                                             )
18              Defendants.                   )
                                             )
19                                           )
                                             )
20                                           )

21         Plaintiff Albert Aguilar, (hereinafter "Plaintiff") alleges as follows:

22                              **NATURE OF THE CASE**

23         1.      This action is brought to remedy Defendants' unlawful conduct directed at

24  Plaintiff. The Plaintiff, like numerous current and previous residents and property owners at the

25  affected "Olin Site" (as hereinafter alleged), has lived, is living, and/or owns property situated on

26  a highly toxic groundwater plume of potassium perchlorate that is a direct result of Defendants'

27  forty years of manufacturing highway flares containing potassium perchlorate, and dumping such

28  potassium perchlorate waste into the soil. Within a year of filing this complaint, Plaintiff

---
1
**First Amended Complaint**

aguilar a ind wpd

1  discovered that Plaintiff's only groundwater source is located within the plume area

2  contaminated with potassium perchlorate, which continues to migrate throughout the affected

3  area. Defendants are responsible for the presence of the contamination, for allowing the toxic

4  waste to remain in the community and fester, and for allowing potassium perchlorate to

5  contaminate the groundwater in and around the Olin Site area and surrounding communities.

6  Despite the fact that Defendants have known about the discharge of poisonous waste materials

7  into the soil for some time, Plaintiff was left to discover the presence of the contamination only

8  after the public was informed by the media in or around January 2003.

9        2.     Plaintiff has a substantial financial investment in Plaintiff's home and real

10  property located within the affected Olin Site and surrounding communities. Plaintiff purchased,

11  built, or had Plaintiff's home built, to live peacefully and safely. Plaintiff had no knowledge that

12  there was potassium perchlorate in the groundwater supplying the community or that Defendants

13  had been dumping or discarding potassium perchlorate so it was allowed to migrate through the

14  soil and into the groundwater aquifer that the community depends upon for water. Plaintiff had

15  no knowledge that Plaintiff's home was built over a chemical dump.

16        3.     Despite California's stringent environmental laws and standards, Defendants

17  created a toxic waste site, left their waste in the soils and allowed it to infiltrate the groundwater

18  system. Now, a toxic dump exists under the neighborhood homes, buildings, playgrounds, and

19  places of business located within the affected Olin Site and surrounding communities, and it is

20  uncertain as to the length of time which will be required for abatement of the contamination, if it

21  can be abated at all. The Plaintiff's inalienable right to quietly enjoy the safety and security in

22  owning property has been destroyed by Defendants' misconduct. Plaintiff is essentially a

23  prisoner of the Olin Site, having lost all ability to sell, market, or finance.

24        4.     The experts are now investigating the extent and scope of the potassium

25  perchlorate contamination. The Defendants are involved in cleaning up the toxic waste for which

26  they are legally responsible. The EPA has not filed a formal action against any of Defendants.

27  Plaintiff fears for Plaintiff's own safety, and for the safety of Plaintiff's family. Neither the short

28  term nor the long term health effects of Plaintiff's exposure to potassium perchlorate through the

**First Amended Complaint**

aguilar a ind .wpd

1   contaminated groundwater is known at this point. Plaintiff must live each and every day with

2   this knowledge that the sanctity of Plaintiff's community is continuously being invaded with a

3   poisonous substance that has rendered the groundwater unusable. Plaintiff has lost the value of

4   Plaintiff's home and real property, the safety of the environment, and now is confronted with the

5   stigma that necessarily attaches to property which is located on or near a toxic waste site.

6                                    **THE PARTIES**

7        5.      Plaintiff Albert Aguilar is an individual residing in San Martin, California. He

8   owns a home and real property which has been damaged by the presence of potassium

9   perchlorate in the groundwater system in his community. Plaintiff Albert Aguilar owns the

10  residence located at 1570 Dias Drive, San Martin, California.

11       6.      Defendant Olin Corporation is a multi-national corporation with annual revenues

12  in excess of $1 billion dollars, derived in part from the international sale of chemicals and

13  munitions, including Winchester ammunition through the Winchester Arms Company.

14  Defendant Olin Corporation is authorized to do business in the State of California and which, at

15  all times relevant hereto, owned and operated a manufacturing facility located in the City of

16  Morgan Hill, County of Santa Clara, State of California. That as part of the ongoing business of

17  Defendant Olin Corporation, Olin was engaged in the process of manufacturing highway safety

18  flares at said facility from 1955 to approximately 1996.

19       7.      Defendant Standard Fusee Corporation was at all times relevant hereto, the lessee

20  of the subject Olin property from 1988 to 1996 and manufactured flares on the Olin property at

21  the Olin plant during that time period.

22       8.      Defendant Orion Safety Products purchased the automotive and marine signal

23  divisions of Olin Corporation in 1988, and is the world's largest manufacturer of emergency

24  flares.

25       9.      The Santa Clara Valley Water District ("SCVWD") is the primary water resources

26  agency for Santa Clara County, California, is the steward for its streams and creeks, underground

27  aquifers and district-built reservoirs and has a duty to prevent pollution of these water sources

28  and to provide clean, safe water for homes and businesses. No claim for money or damages is

1 sought against the SCVWD through this Complaint.

2      10.    Defendant Anne Lee, was at all times relevant hereto, the supervisor of

3 manufacturing services for Defendants and an employee of Olin Corporation and Standard Fusee

4 Corporation, and a resident of California.  As an individual, said Defendant was directly involved

5 in, and is specifically responsible for, the intentional waste dumping of potassium perchlorate

6 onto the soil and into the percolating ponds located on the Olin Site, and as such is personally

7 responsible for the groundwater contamination in and around the Olin Site area and surrounding

8 communities.  Said Defendant knew or should have known that the drinking water wells in and

9 around the Olin site area and surrounding communities would be contaminated by the intentional

10 waste dumping of potassium perchlorate into the soil and into the unlined evaporation pond.

11 Defendant's acts amounted to willful poisoning, making said Defendant individually responsible.

12      11.    Defendant Yoshio Suekawa, was at all times relevant hereto, the manufacturing

13 superintendent for Defendants and an employee of Olin Corporation and Standard Fusee

14 Corporation, and a resident of California.  As an individual, said Defendant was directly involved

15 in, and is specifically responsible for, the intentional waste dumping of potassium perchlorate

16 onto the soil and into the percolating ponds located on the Olin Site, and as such is personally

17 responsible for the groundwater contamination in and around the Olin Site area and surrounding

18 communities.  Said Defendant knew or should have known that the drinking water wells in and

19 around the Olin site area and surrounding communities would be contaminated by the intentional

20 waste dumping of potassium perchlorate into the soil and into the unlined evaporation pond.

21 Defendant's acts amounted to willful poisoning, making said Defendant individually responsible.

22      12.    DOES 1 to 50 are persons whose identities are unknown to Plaintiff at this time.

23 Defendants DOES 1 to 50 are business entities controlled by, and/or agents of and/or employees

24 of and/or affiliated with Defendants.  Plaintiff is ignorant of the true names and capacities of the

25 Defendants sued herein under the fictitious names DOES 1 to 50.  They are sued herein pursuant

26 to C.C.P. § 474.  When Plaintiff becomes aware of the true names and capacities of the

27 Defendants sued as DOES 1 to 50, Plaintiff will amend this Complaint to state their true names

28 and capacities.

First Amended Complaint

aguilar a ind ..wpd

1    13.    Each Defendant sued herein was the principal, agent, or employee of the other,

2  and was acting within the scope of such agency or employment.  Each Defendant sued herein was

3  the co-conspirator of the other and was acting within the course and scope of a conspiracy

4  formed amongst each of them.  Each Defendant sued herein aided and abetted the other with the

5  intent that each would be successful in their mutual endeavors.  Each Defendant sued herein

6  received money or property as a result of the conduct described herein without consideration

7  therefore and/or with knowledge that the money or property was obtained as a result of the

8  wrongful conduct described herein.  Each entity Defendant sued herein is a shell organization,

9  and is actually the alter ego of the other Defendants sued herein.

10    14.    "OLIN," "Defendants," and/or "Defendant" as used in this Complaint refers to all

11  Defendants as well as DOES 1 to 50.

12                       JURISDICTION AND VENUE

13    15.    This Court has jurisdiction over this action pursuant to California Code of Civil

14  Procedure section 410.10.

15    16.    Venue is proper in this Court pursuant to Code of Civil Procedure sections 395

16  and 395.5 in that Defendants breached their duties and because liability arises in the County of

17  Santa Clara.  Further the Defendants either maintain  offices, transact business, have agents, are

18  found, or reside, in the County of Santa Clara.  Plaintiff is informed and believes that the

19  unlawful misconduct took place in Santa Clara County at Olin Corporation's facility in Morgan

20  Hill in the State of California.  Furthermore, many of the unlawful acts herein alleged were

21  committed or perpetrated within the County of Santa Clara.

22    17.    No portion of this Complaint is brought pursuant to federal law.

23                  POTASSIUM PERCHLORATE OVERVIEW

24    18.    At all relevant times, potassium perchlorate has been known to be an herbicide

25  that is toxic to animals and people.

26    19.    Potassium perchlorate's effect on thyroid function was discovered in 1952 and has

27  been confirmed repeatedly since then.  (Stanbury and Wyngaarden 1952; Kessler and

28  Krunkemper 1966; Lampe, et al. 1967; Brown-Grant and Sherwood 1971; Gauss 1972; Mannisto

First Amended Complaint

aguilar a ind .wpd

1   1979.)

2       20.    Potassium perchlorate was first suspected as a carcinogen in 1966, when a long

3   term study on the effects of potassium perchlorate in drinking water was reported. After two

4   years of potassium perchlorate consumption, more than a third of potassium perchlorate-fed lab

5   animals developed benign thyroid tumors, compared with none of the control animals. (Kessler

6   and Krunkemper 1966.) Although potassium perchlorate does not directly cause cancer,

7   potassium perchlorate-induced tumors result from changes in the thyroid caused by hormone

8   interference. Similar effects are seen with other thyroid hormone disruptors. The severity of

9   these precursor lesions have a dose response relationship (the more that is consumed, the greater

10  the risk) and for that reason the EPA considers potassium perchlorate to be a probable

11  carcinogen.

12      21.    Studies in the 1950s showed that potassium perchlorate could pass through the

13  placenta and it affected fetuses more seriously than adults. (Postel 1957; Brown-Grant and

14  Sherwood 1971.) This is significant. Potassium perchlorate's risks are greater to children

15  because of the relationship between maternal and fetal thyroid hormone levels and neurological

16  development. Since the 1970s the consequences of depressed thyroid hormone levels on

17  developing fetuses and infants have been known to be devastating and even temporary disruption

18  of thyroid hormones can lead to permanent defects in the developing organism. In 1969 it was

19  revealed that mild maternal hypothyroidism can cause reduced IQ in children. (Man and Jones

20  1969.) Thyroid hormones are crucial to proper development of many organ systems, including

21  the nervous and reproductive systems (Porterfield 1994; Jannini 1995) and toxins that disrupt

22  thyroid function can be expected to impact neurological developmental and increase the risk of

23  mental retardation, vision, speech and hearing impairment, delayed reflex development, and

24  impaired fine motor skills.

## FACTUAL ALLEGATIONS

26      22.    This action is brought to remedy Defendants' unlawful conduct directed at

27  Plaintiff. The Plaintiff, a property owner at the affected Olin Site, has lived, is living, and/or

28  owns real property situated above a highly toxic groundwater plume of potassium perchlorate,

First Amended Complaint

aguilar a ind  wpd

1   that is a direct result of Defendants' forty years of manufacturing highway flares containing

2   potassium perchlorate, and dumping such potassium perchlorate waste into the soil.

3         23.    Within a year of filing this complaint, Plaintiff discovered that Plaintiff's only

4   groundwater source is located in the plume area contaminated with potassium perchlorate, which

5   continues to migrate throughout the affected area.  Defendants are responsible for the presence of

6   the contamination, for allowing the toxic waste to remain in the community and fester, and for

7   allowing potassium perchlorate to contaminate the groundwater in and around the Olin Site area

8   and surrounding communities.  Despite the fact that Defendants have known about the discharge

9   of poisonous waste materials into the soil for some time, Plaintiff was left to discover the

10  presence of the contamination only after the public was informed by the media in or around

11  January 2003.

12        24.    It is common knowledge, and was well known to each of the individual

13  managers, supervisors and superintendents employed by the Defendants, that the chemicals being

14  dumped onto the soil and into the evaporation pond located on the Olin Site were and are

15  dangerous to the surrounding communities, and in fact, a massive explosion occurred in the

16  1970's as a result of the Defendants' waste dumping on the Olin Site, which blew-out windows in

17  numerous structures in the vicinity.

18        25.    It is common knowledge, and was well known to each of the individual managers,

19  supervisors and superintendents employed by the Defendants, that the Olin Site is located above

20  a groundwater aquifer that supplies the drinking water to the Olin Site area and surrounding

21  communities, nonetheless, the individual managers directed that the waste potassium perchlorate

22  be dumped onto the soil and into the evaporation pond on the Olin Site.

23        26.    The Olin Corporation operated the facility from the 1950s until about March 1988

24  when Standard Fusee Corporation leased the facility from Olin.  Highway flares and railroad

25  flares are the main product manufactured by both Olin Corporation and Standard Fusee at the

26  Olin Site.

27        27.    In 1986, soil samples were taken along the northeastern boundary of the Olin Site.

28  Two soil borings down to 16 feet below ground surface and one down to 11 feet below ground

---

7

**First Amended Complaint**

1    surface were drilled along the Olin Site's northern property line. A composite soil sample was

2    taken from each boring and analyzed for 15 compounds, including potassium perchlorate. The

3    results indicated a concentration of potassium perchlorate in the soil of up to one (1) part per

4    million or one hundred (100) parts per billion.

5         28.    At all relevant times, it was public knowledge that waste potassium perchlorate

6    was dumped into an unlined evaporation pond located on the Olin site, and that such unlined

7    evaporation pond was used from about 1951 to 1987. The evaporation pond, about 15 feet by 15

8    feet in size, is known to have received wastes from the cleaning process of the ignition material

9    mixing bowls which were cleaned on site. This process consisted of boiling a solution of water

10   and soda ash in the mixing bowls and discharging the liquid and ignition material residues,

11   including potassium perchlorate, into the unlined evaporation pond.

12        29.    In 1987, Olin closed the evaporation pond and in late 1987 or early 1988 the

13   evaporation pond was drained and the bottom layer of soil was removed and spread out onto the

14   adjacent field, creating a perchlorate leach field.

15        30.    The Olin Site is located within a portion of the Las Llagas sub-basin in the

16   southern leg of the Santa Clara Valley. The groundwater below the site is located within one

17   unconfined aquifer, and flows from the northwest to the southeast, and is not stratified. The

18   aquitards that exist in the aquifer are not extensive and do not prohibit the flow of groundwater to

19   the lower portions of the aquifer, which is not protected from surface contaminants.

20        31.    There is a municipal well within 300 feet of the site that is one of 12 wells in a

21   blended water supply system for the City of Morgan Hill. The municipal water system supplies

22   water to thousands of people in the City of Morgan Hill area. This is separate and apart from

23   approximately 2000 wells south of Morgan Hill and north of Gilroy

24        32.    The Santa Clara Valley Water District ("SCVWD") is the primary water resources

25   agency for Santa Clara County, California, is the steward for its streams and creeks, underground

26   aquifers and district-built reservoirs and has a duty to prevent pollution of these water sources

27   and to provide clean, safe water for homes and businesses. To accomplish this the SCVWD

28   monitors groundwater quality at least on an annual basis through monitoring wells throughout the

---

8

First Amended Complaint

aguilar a ind wpd

1  groundwater basin which are designed to monitor for common groundwater constituents and

2  unnatural constituents including, but not limited to, organic solvents, gasoline additives, nitrates

3  and chloride.

4       33.    The SCVWD has a duty to ensure a safe and healthy supply of groundwater. The

5  SCVWD manages the groundwater basin to fulfill the objectives of the District Act and its

6  mission. The goal of these groundwater management efforts has been, and continues to be, to

7  ensure that groundwater resources are sustained and protected. As part of the District's Global

8  Governance Commitment adopted by the Board of Directors, the District will provide a healthy,

9  clean, reliable, and affordable water supply that meets or exceeds all applicable water quality

10  regulatory standards in a cost-effective manner. The District has ineffectively managed the

11  groundwater basin to fulfill the objectives of the District Act and its mission to sustain and

12  protect groundwater resources. Overall, the District's groundwater protection programs have been

13  ineffective in protecting the groundwater basin from contamination.

14       34.    In addition, the SCVWD has a duty to maintain groundwater basins and is legally

15  authorized to collect revenues from well owners for the water they use.  Such water usage is

16  monitored by a meter that the SCVWD requires to be installed.  In addition, the SCVWD through

17  its Well Ordinance Program is responsible for issuing permits for wells and inspecting all well

18  construction activities in Santa Clara County to make sure that wells do not threaten groundwater

19  resources in the county.

20       35.    By monitoring the quality of the groundwater basin, the District can discover

21  adverse water quality trends before conditions become severe and intractable, so that timely

22  remedial action to prevent or correct costly damage can be implemented. In general, the District

23  monitors groundwater quality to ensure that it meets water quality objectives for all designated

24  beneficial uses, including municipal and domestic, agricultural, industrial service, and industrial

25  process water supply uses.

26       36.    At all relevant times, the SCVWD knew or should have known that potassium

27  perchlorate was present in several monitoring wells and soil samples on or near the Olin Site,

28  that the groundwater basin in the area was polluted, that the pollutants were spreading

9

**First Amended Complaint**

aguilar a 'ind  wpd

1   underground into the San Martin drinking water and that people, and particularly children were at

2   risk for severe injuries caused by potassium perchlorate and that property damage was occurring

3   and would occur with regard to the owners of all private property in the area.

4       37.     Plaintiff has a substantial financial investment in the home and real property

5   located within the affected Olin Site and surrounding communities. Plaintiff purchased, built, or

6   had Plaintiff's home built so Plaintiff could live peacefully and safely. Plaintiff had no idea that

7   there was potassium perchlorate in the groundwater supplying the community or that Defendants

8   had been dumping or discarding potassium perchlorate so it was allowed to migrate through the

9   soil and into the groundwater aquifer that the community depends upon for water. Plaintiff had

10   no idea that Plaintiff's home was built over a chemical dump.

11       38.     Despite California's stringent environmental laws and standards, Defendants

12   created a toxic waste site, left their waste in the soils and allowed it to infiltrate the groundwater

13   system. Now, a toxic dump exists under the neighborhood homes, buildings, playgrounds, and

14   places of business located within the affected Olin Site and surrounding communities, and it is

15   uncertain as to the length of time which will be required for abatement of the contamination, if it

16   can be abated at all. Plaintiff is essentially a prisoner of the Olin Site, having lost all ability to

17   sell, market, or finance.

18       39.     The experts are now investigating the extent and scope of the potassium

19   perchlorate contamination. The Defendants are involved in cleaning up the toxic waste for which

20   they are legally responsible. The EPA has not filed a formal action against any of Defendants.

21   Plaintiff now fears for Plaintiff's own safety, and for the safety of Plaintiff's family.

22       40.     Neither the short term nor the long term health effects of Plaintiff's exposure to

23   potassium perchlorate through the contaminated groundwater is known at this point. Plaintiff

24   must live each and every day with this knowledge that the sanctity of Plaintiff's community is

25   continuously being invaded with a poisonous substance that has rendered the groundwater

26   unusable.

27       41.     Plaintiff has lost the value of Plaintiff's home, the safety of the environment, and

28   now is confronted with the stigma that necessarily attaches to property which is located on or

First Amended Complaint

aguilar a ind .wpd

1  near a toxic waste site.

2                           **FIRST CAUSE OF ACTION**

3                  **[Negligence Against All Defendants Except SCVWD]**

4          42.     Plaintiff hereby incorporates by reference paragraphs 1 through 41 above as

5  though fully set forth herein, and further alleges:

6          43.     Plaintiff claims that Defendants were negligent.

7          44.     At all times material herein, Defendants were under a duty to conduct its business

8  of manufacturing highway flares with due and reasonable care imposed by law.  Defendants were

9  at all times relevant hereto under the strictest duty of care to conduct themselves in a non-

10  negligent reasonable manner according to the reasonable product person standard.

11         45.     Defendants violated this duty of due and reasonable care and said violation was

12  despicable, wanton and reckless and calculated to cause grievous harm to the Plaintiff.

13         46.     Plaintiff has in the past and will in the future sustain damages as a result of the

14  negligence of the Defendants in their failure to contain and properly dispose of waste and by-

15  products, including potassium perchlorate, from the manufacture of highway flares.

16         47.     As a proximate result of the aforesaid carelessness and negligence of said

17  Defendants, the aforesaid conduct caused severe injury to Plaintiff and thereby proximately

18  caused Plaintiff to sustain damages and injuries as herein alleged.

19                          **SECOND CAUSE OF ACTION**

20                   **[Nuisance Against All Defendants Except SCVWD]**

21         48.     Plaintiff hereby incorporates by reference paragraphs 1 through 41 above as

22  though fully set forth herein, and further alleges:

23         49.     Plaintiff at all times herein mentioned has the inalienable right to own, enjoy, and

24  use Plaintiff's residence and property without interference by other property owners such as

25  Defendants who choose to undertake ultrahazardous activities on their land, and to not have that

26  right impaired by the introduction into the groundwater system of toxic substances by

27  Defendants.

28         50.     Defendants, and each of them, have a public duty to conduct their business, and in

---

                                    11
                          **First Amended Complaint**

aguilar a ind .wpd

1    particular the mass storage and disposal of hazardous toxic substances, in a manner that does not

2    damage the public welfare and safety.

3        51.    At all times mentioned herein the conduct of said Defendants caused hazardous

4    substances and toxins, including potassium perchlorate to be discharged/disposed of into the soil

5    and groundwater supply of the communities around the subject Olin Site. The substances

6    penetrated the soil and contaminated the groundwater and have been distributed throughout the

7    community as a result of being carried through the groundwater system.

8        52.    The aforementioned discharges emanated from land upon which Defendants

9    carried on activities in conjunction with the operation of their businesses, at all times mentioned

10    herein, and for forty years prior thereto.

11        53.    The aforementioned conduct of said Defendants constitutes a nuisance within the

12    meaning of §3479 of the Civil Code in that it is injurious and/or offensive to the senses of

13    Plaintiff, and/or interferes with Plaintiff's comfortable enjoyment of life, and/or of their property,

14    and/or unlawfully obstructs the free use, in the customary manner, of Plaintiff's property

15    including, but not limited to, all uses particular to residential living, recreation and work. The

16    contamination and its concomitant spoliation of the community groundwater supply is a

17    continuing and/or permanent nuisance which adversely impacts the use and/or value of Plaintiff's

18    property.

19        54.    As a direct and proximate result of said wrongful conduct, Plaintiff has suffered

20    economic damages including, but not limited to, lost use of property, denial of useful and quiet

21    enjoyment of property, diminution in the fair market value of property, impairment of the

22    salability of property, and losses related to residual toxic contamination, which has caused said

23    property to be stigmatized. Plaintiff alleges that said damages are in excess of the minimum

24    jurisdictional amount of this Court to be set forth according to proof at trial.

25        55.    As a further and direct proximate result of Defendants' wrongful conduct, the

26    Plaintiff has suffered, and will continue to suffer, pain, discomfort, anxiety, fear, worries, stress,

27    and mental and emotional distress, all to the Plaintiff's general damage in an amount to be set

28    forth according to proof.

First Amended Complaint

aguilar a ind .wpd

56.     Unless the nuisance is abated, Plaintiff's property and rights of enjoyment will be progressively further diminished in value.

57.     The nuisance is specially injurious to Plaintiff, in that Plaintiff is a property owner who has substantial equity, or has committed substantial financial resources toward the purchase and/or development of Plaintiff's respective property, without knowledge of the extent of damage, economic and otherwise, which would result from a toxic site. Plaintiff will be adversely affected by the nuisance unless and/or until it is abated.

58.     The wrongful acts of Defendants were done maliciously, oppressively, and fraudulently, and Plaintiff is entitled to punitive and exemplary damages in an amount to be ascertained according to proof, which is appropriate to punish or set an example of Defendants.

## THIRD CAUSE OF ACTION

**[Intentional Infliction of Emotional Distress Against All Defendants Except SCVWD]**

59.     Plaintiff hereby incorporates by reference paragraphs 1 through 41 above as though fully set forth herein, and further alleges:

60.     Defendants' conduct in connection with the disposal of potassium perchlorate was done despite Defendants' knowledge that the potassium perchlorate was present and was known to be and were specifically designated as hazardous to human health. Defendants chose to place their interests in securing a profit from the manufacture of highway flares above the safety and health of the affected community.

61.     Defendants at all relevant times knew of the existence of Plaintiff and the affected community, knew that Plaintiff would be exposed to potassium perchlorate as a result of Defendants' conduct, and knew that the discovery of these facts by Plaintiff would necessarily cause Plaintiff to suffer injury, including severe emotional distress. Nevertheless, Defendants intentionally proceeded with their manufacture of highway flares and reckless disposal of waste and by-products, including potassium perchlorate.

62.     Defendants' conduct in connection with the disposal of potassium perchlorate was undertaken with reckless disregard of the Plaintiff and the affected community.

63.     As a direct and proximate result of Defendants' conduct alleged herein, Plaintiff

First Amended Complaint

aguilar a ind  wpd

1    suffers severe and extreme emotional distress.

2        64.    As a further and direct proximate result of said wrongful conduct, Plaintiff has

3    suffered, and will continue to suffer pain, discomfort, anxiety, fear, worries, stress, and mental

4    and emotional distress, all to the Plaintiff's general damage in an amount to be set forth

5    according to proof at trial.

6        65.    The wrongful acts of Defendants were done maliciously, oppressively, and

7    fraudulently, and Plaintiff is entitled to punitive and exemplary damages in an amount to be

8    ascertained according to proof, which is appropriate to punish or set an example of Defendants.

9                            **FOURTH CAUSE OF ACTION**

10                **[Trespass Against All Defendants Except SCVWD]**

11       66.    Plaintiff hereby incorporates by reference paragraphs 1 through 41 above as

12   though fully set forth herein, and further alleges:

13       67.    Plaintiff at all times herein mentioned, had interest and title in Plaintiff's property

14   and the right to quiet and useful enjoyment thereof, as well as Plaintiff's surrounding living

15   environment, including the groundwater.

16       68.    As a direct and proximate result of the intentional, reckless, or negligent conduct

17   of Defendants, and each of them, as alleged herein, the presence of potassium perchlorate has

18   infiltrated the soil, which in turn contaminated the groundwater and has irreparably damaged

19   Plaintiff's interests in property and water.

20       69.    As a direct and proximate result of said wrongful conduct, Plaintiff has suffered

21   economic damages including, but not limited to, lost use of property, denial of useful and quiet

22   enjoyment of property, diminution in the fair market value of property, impairment of the

23   salability of property, and losses related to residual toxic contamination, which has caused said

24   property to be stigmatized.  Plaintiff alleges that said damages are in excess of the minimum

25   jurisdictional amount of this Court to be set forth according to proof at trial.

26       70.    As a further and direct proximate result of said wrongful conduct, the Plaintiff has

27   suffered, and will continue to suffer, pain, discomfort, anxiety, fear, worries, stress, and mental

28   and emotional distress, all to the Plaintiff's general damage in an amount to be set forth

                                        14
                            **First Amended Complaint**

aguilar a ind .wpd

1  according to proof at trial.

2       71.    As a direct and proximate result of Defendants' conduct alleged herein, Plaintiff

3  suffers severe and extreme emotional distress.

4       72.    Defendants' acts and omissions which constitute trespass as described herein were

5  committed with malice, fraud and oppression thereby entitling Plaintiff to exemplary or punitive

6  damages.

7  **FIFTH CAUSE OF ACTION**

8  **[Equitable (Injunctive and/or Declaratory) Relief and Damages**

9  **Against All Defendants Except SCVWD]**

10       73.    Plaintiff hereby incorporates by reference paragraphs 1 through 41 above as

11  though fully set forth herein, and further alleges:

12       74.    Plaintiff has no adequate remedy at law, rendering injunctive and other equitable

13  relief appropriate in that damages cannot adequately compensate Plaintiff for the injuries suffered

14  and threatened.

15       75.    Accordingly, Plaintiff requests the following equitable relief:

16          a.    That a judicial determination and declaration be made of the rights of

17  Plaintiff and the corresponding responsibilities of Defendants; and

18          b.    That the Defendants be ordered to remediate the groundwater

19  contamination as alleged herein.

20       76.    Plaintiff is entitled to compensation for economic losses as provided under the

21  Laws of the State of California.

22  **SIXTH CAUSE OF ACTION**

23  **[Punitive Damages Against All Defendants Except SCVWD]**

24       77.    Plaintiff hereby incorporates by reference paragraphs 1 through 41 above as

25  though fully set forth herein, and further alleges:

26       78.    Defendants' actions were oppressive, malicious, grossly negligent, wilful and

27  wanton and exhibit a callous disregard for Plaintiff's rights.

28

15

First Amended Complaint

aguilar a ind .wpd

# SEVENTH CAUSE OF ACTION

## [Individual Claim Against SCVWD Strictly Limited to Equitable (Injunctive and/or Declaratory) Relief]

79.     Plaintiffs hereby incorporate by reference paragraphs 1 through 41 above as though fully set forth herein, and further allege:

80.     The Plaintiffs have no adequate remedy at law, rendering injunctive and other equitable relief appropriate in that damages cannot adequately compensate Plaintiffs for their inability to use their contaminated groundwater for household, business and/or agricultural purposes resulting from SCVWD's acts and/or omissions.

81.     No portion of this Complaint seeks money or damages as against Defendant SCVWD.

82.     Accordingly, Plaintiffs request the following equitable relief:

a.     That a judicial determination and declaration be made of the rights of the Plaintiffs and the corresponding rights and responsibilities of the SCVWD.

b.     A Court order prohibiting SCVWD from further collecting any groundwater usage charge and/or groundwater well monitoring charge from Plaintiffs.

c.     A Court declaration that the SCVWD failed to fulfill its duties under the District's Global Governance Commitment adopted by the Board of Directors, that the District will provide a healthy, clean, reliable, and affordable water supply that meets or exceeds all applicable water quality regulatory standards, according to proof.

WHEREFORE, Plaintiff prays for relief as follows:

1.     That judgment be entered in favor of the Plaintiff;

2.     Relief in the form of an order requiring Defendants, except the SCVWD, to remediate the groundwater contamination as alleged herein;

3.     Relief in the form of a judicial determination and declaration of the rights of Plaintiff and the corresponding responsibilities of Defendants;

4.     Attorney's fees, expenses and costs of this suit;

5.     For damages, according to proof, including general damages, treble damages, and

16

First Amended Complaint

aguilar a ind .wpd

1   exemplary and punitive damages, except against the SCVWD;

2        6.     For interest, including pre-judgment and post-judgement interest, as permitted by

3   law; and

4        7.     Such additional relief as this Court deems necessary, just and proper.

5

6   Dated: March   25 , 2003                 ALEXANDER, HAWES & AUDET, LLP

7

8                               By: _____

9                                  Richard Alexander
                                Attorneys for Plaintiffs

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

17
First Amended Complaint

aguilar a ind wpd