**COPY**

APR 16 2003

1  MARK P. RAPAZZINI (SB #111944)
   M. ELIZABETH GRAHAM (SB #143085)
2  RAPAZZINI & GRAHAM LLP
   One Market, Spear Tower, Suite 2000
3  San Francisco, CA  94105-1104
   Telephone:  (415) 371-2272
4  Facsimile:  (415) 371-2290

5  COLIN L. PEARCE (SB #137252)
   TIMOTHY W. MOPPIN (SB #133363)
6  MATTHEW K. KLISZEWSKI (SB #218832)
   DUANE MORRIS LLP
7  One Market, Spear Tower, Suite 2000
   San Francisco, CA  94105-1104
8  Telephone:  415-371-2200
   Facsimile:  415-371-2201

9
   Attorneys for Plaintiffs
10 JANE PALMISANO and RICHARD PALMISANO          E-FILING

11          UNITED STATES DISTRICT COURT

12       FOR THE NORTHERN DISTRICT OF CALIFORNIA

13             SAN JOSE DIVISION

14                                      C03  01607 ARB
                                                        H

15 JANE PALMISANO and RICHARD
   PALMISANO, individuals,            COMPLAINT FOR
16                                     (1) NEGLIGENCE;
            Plaintiffs,                (2) NEGLIGENCE *PER SE*;
17                                     (3) STRICT LIABILITY FOR ULTRA
            v.                             HAZARDOUS ACTIVITY;
18                                     (4) TRESPASS;
   OLIN CORPORATION, a corporation,    (5) PRIVATE NUISANCE;
   STANDARD FUSEE CORPORATION, doing   (6) PUBLIC NUISANCE;
19 business as ORION SAFETY PRODUCTS, a (7) INTENTIONAL AND NEGLIGENT
   Delaware corporation, and DOES 1 through 50,  INFLICTION OF EMOTIONAL
20                                         DISTRESS;
            Defendants.                (8) DAMAGES UNDER CERCLA; AND
21                                     (9) DECLARATORY RELIEF UNDER
                                           CERCLA
22
                                       DEMAND FOR JURY TRIAL
23
        Plaintiffs Jane Palmisano and Richard Palmisano allege as follows:
24
                        **INTRODUCTION**
25
        1.     This action is brought by Jane Palmisano and Richard Palmisano (collectively, the
26
   "Palmisanos"), a married couple who own a home and reside in San Martin, California, an
27
   unincorporated area south of the City of Morgan Hill in Santa Clara County.  There is no public
28

COMPLAINT

Filed By
One Legal

1  water supply available to San Martin. The Palmisanos, like the rest of their neighbors, obtain all of

2  the water for their property, including drinking water, from a private groundwater well. Like many

3  of their neighbors, the Palmisanos very recently learned that their groundwater supply is

4  contaminated with potassium perchlorate, an extremely toxic contaminant used as an oxidizer and

5  explosive propellant in rocket fuel, flares and other products.

6       2.      Defendants Olin Corporation and Standard Fusee Corporation (these entities are

7  referred to herein, when appropriate, as "Olin" and "Standard Fusee," or collectively as

8  "Defendants") are directly responsible for the presence of this contaminant in the soil and

9  groundwater beneath the San Martin community. For more than forty years, Olin and later Standard

10  Fusee (operating under an agreement with Olin and using Olin's name) owned, operated and

11  maintained a manufacturing facility on a thirteen acre site located at 425 Tennant Avenue, in

12  Morgan Hill, California (hereinafter the "Site"). From 1956 until approximately 1996, Defendants

13  manufactured, among other things, emergency and safety flares. Defendants used potassium

14  perchlorate in their manufacturing processes, specifically as an oxidizer in flares, throughout this

15  entire time period. Defendants were careless in their handling and in their disposal of this dangerous

16  chemical. They improperly, negligently, continuously and in violation of state and federal law

17  disposed of perchlorate, thus causing perchlorate to migrate into the local groundwater basin and the

18  area's water supply.

19       3.      The perchlorate contamination has created a "plume" in the groundwater basin in

20  Southern Santa Clara County, which plume has migrated in directions away from the Site, to San

21  Martin, and eventually contaminated the Palmisanos' property and drinking water supply. The

22  groundwater below the Site is located within an aquifer that flows Northwest to Southeast.

23       4.      By Defendants' own admissions, perchlorate should not be ingested. Perchlorate is

24  known to have numerous adverse health affects, including causing thyroid disorders, tumors, thyroid

25  cancer, and birth defects. Studies show that at even low levels of concentration, perchlorate can be

26  harmful to one's health. It is particularly harmful when ingested by pregnant women, and by

27  children.

28

COMPLAINT

5.   The Palmisanos cannot avoid the effects of perchlorate through boiling water or other water filtration systems.  Further, the Palmisanos cannot leave their property because they cannot sell their property at fair market value, thereby allowing them to relocate.  The Palmisanos have invested substantial sums of money in their property, and had no idea that perchlorate was in the groundwater.  Informed purchasers do not want to buy a home or any real estate in a community that has no drinkable or useable water, and sits above a toxic plume.

6.   Presently there are no available or known methods to satisfactorily clean up or remediate the perchlorate in the groundwater basin.  Indeed, experts from the United States Environmental Protection Agency ("EPA") have gone on record as saying that it likely will take more than forty years to clean up the toxic plume created by Defendants, if it is possible at all. Accordingly, the water supply for the Palmisanos' property is presently and permanently contaminated with a toxic chemical.

7.   The Palmisanos bring this action to recover actual, present damage caused by the presence of perchlorate in their water supply and soil, the loss of their use and enjoyment of their property, losses to the value of their property caused by Defendants' contamination of their drinking water supply, emotional distress damages, consequential damages resulting from the contamination of their property and drinking water supply, and related damages.

8.   The Palmisanos' damages, including property damage, is caused by exposure to hazardous substances, pollutants and/or contaminants released into the environment from the Site.

## JURISDICTION, VENUE AND INTRADISTRICT ASSIGNMENT

9.   This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) and 28 U.S.C. § 1441(a) because the amount in controversy exceeds the sum of $75,000, and there is a complete diversity of citizenship among the parties to the action.

10.   Venue in the Northern District of California, and assignment to the San Jose Division of this Court, is proper pursuant to 28 U.S.C. § 1391, and Local Rules 3-2(c) and (e) of the United States District Court for the Northern District of California, because the Palmisanos own property at issue in this action and reside within this district and in Santa Clara County, and the releases,

COMPLAINT

3

discharges, occurrences, violations and damages alleged in this complaint occurred within this

district and in Santa Clara County.

## PARTIES

11.    Plaintiffs Jane Palmisano and Richard Palmisano are individuals, husband and wife, and residents of San Martin, County of Santa Clara, State of California.

12.    The Palmisanos reside in and own property on Amistad Lane, San Martin, California. The property consists of three acres of land, a single family house, a barn, additional buildings and related improvements. The Palmisanos have lived and resided at the property with their children since 1990, and have raised animals and cultivated crops on the property for profit and for their personal use and enjoyment.

13.    Defendant Olin Corporation is a corporation organized and existing under the laws of the State of Virginia, with headquarters in Norwalk, Connecticut. At all times material herein Olin was authorized to do business, and did business, in the State of California. Among other things, Olin is a chemical manufacturer that has been in business for over one hundred years. Currently, Olin is a leading North American producer of copper alloys, chlorine and caustic soda. In 2001, Olin posted sales of approximately $1.3 billion. The company has three business lines, including Winchester ammunition, and has approximately 5,900 employees and manufacturing locations throughout the United States. Since 1956, Olin owned and operated a highway flare factory and related structures and facilities on the Site, located within some ten miles of the Palmisanos' property, at 425 Tennant Avenue, Morgan Hill, California.

14.    Defendant Standard Fusee Corporation, currently doing business as Orion Safety Products, is a corporation organized and existing under the laws of the State of Delaware. At all times material herein Standard Fusee was authorized to do business, and did business, in the State of California. Standard Fusee is the world's largest manufacturer of emergency flares. Standard Fusee acquired the Signal Products Division from Olin in 1988, and as part of the agreement between these two Defendants, Standard Fusee was allowed to use the Olin name for five years. That agreement expired in 1993, and the name Orion supplanted Olin on all packaging and literature.

COMPLAINT

4

1    15.    The true names and capacities, whether individual, corporate, associate or otherwise,

2  of Defendants named fictitiously herein as DOES 1 through 50, inclusive, are presently unknown to

3  the Palmisanos, who therefore sue said Defendants by such fictitious names. The fictitiously named

4  Defendants include, but are not limited to, the successors, predecessors, principals, agents, servants,

5  employees and independent contractors of the Defendants named hereinabove. The Palmisanos are

6  informed and believe, and on that basis allege, that each of the fictitiously named Defendants is

7  legally responsible for the events hereinafter described and is jointly and severally liable to the

8  Palmisanos, as more particularly alleged hereinafter. The Palmisanos will amend this complaint to

9  set forth the true names and capacities of said DOE Defendants as soon as the same have been

10  ascertained.

11    16.    The Palmisanos are informed and believe, and on that basis allege, that at all times

12  relevant hereto each Defendant was the agent or employee of every other Defendant, that each

13  Defendant was at all times acting within the course and scope of said agency or employment, and

14  that each Defendant ratified and approved the acts of each other Defendant as its agent or employee

15  in the course of conduct hereinafter set forth.

16                              **FACTUAL ALLEGATIONS**

17    **A.    Perchlorate is a Harmful, Toxic Chemical**

18    17.    Perchlorate is a highly toxic chemical and is widely known to produce adverse health

19  effects, including an increased risk of cancer. Perchlorate binds weakly to soil particles and is not

20  significantly broken down in the environment. It is extremely soluble in water and highly mobile,

21  migrating faster and further than many other water contaminants. These characteristics make

22  perchlorate a particularly persistent and problematic contaminant once it is allowed to enter a

23  groundwater system.

24    18.    Perchlorate impairs normal thyroid function because it is taken up preferentially by

25  the thyroid gland in place of iodide. The thyroid gland is therefore deprived of iodide, a necessary

26  nutrient which it is designed to concentrate. Without iodide the thyroid hormone is inactive. As a

27  result, perchlorate can disrupt the delicate balance of hormone levels in the body which are crucial

28  for healthy metabolism, growth and development.

COMPLAINT

19.     Perchlorate's effect on the thyroid has been known for decades. It was discovered in 1952 and has been confirmed by a series of studies since then. The scientific community has been aware of the hazardous and harmful effects of perchlorate for decades. Scientists have been examining the potential negative health effects of perchlorate at low doses since the early 1990s. Studies have shown that perchlorate's effect on the thyroid may lead to thyroid cancer.

20.     The EPA issued its first provisional reference dose for perchlorate in 1992 at four parts per billion (ppb) based upon an adult body weight. In 1995, the EPA found that laboratory animals developed thyroid disorders after only two weeks of drinking perchlorate laced water. Studies in 1998 confirmed this at even lower dose levels. In 1998, perchlorate was placed on the contaminant candidate list for National Primary Drinking Water Regulation.

21.     Perchlorate is now a known health risk, even at low levels. The EPA has proposed a standard of one ppb as a maximum tolerance level for contamination. Children are at a far greater risk for the effects of thyroid hormone disruption. Children not only drink more water, but their developing brains and bodies are more susceptible to hormone disruption.

22.     Pregnant women and their fetuses are at the greatest risk. Developing fetuses rely upon the mother's thyroid during the first trimester of pregnancy. Fluctuation in or disruption of the mother's thyroid can cause serious health problems, including devastating birth defects.

**B.     Defendants Caused the Release and Discharge of Perchlorate**

23.     The characteristics and the nature of perchlorate have been known to Defendants for decades. By their conduct, Defendants caused hazardous substances and toxic chemicals, including potassium perchlorate, to be dumped into the soil around the Site, and into unlined evaporation ponds on the Site, and otherwise improperly stored, disposed of and collected the hazardous substances. This in turn allowed these substances to seep into and be released into the local water supply and soil in, around, and underneath the Site.

24.     Defendants knew that the Site is located above the large groundwater aquifer that serves as the sole drinking water supply for a large portion of the population in the San Martin area and the City of Morgan Hill, and Defendants further knew that the hazardous substances and chemicals, including potassium perchlorate, that Defendants were intentionally and negligently

1  releasing and discharging would contaminate this water supply and cause related damages to

2  individuals in the community.

3      25.     Beginning in 1956, Defendants owned and operated a manufacturing facility at the

4  Site.  Defendants manufactured and warehoused "clay pigeons," or skeet targets and flares.

5  Potassium perchlorate was used in the manufacture of flares as an explosive propellant.  The

6  manufacturing materials were mixed on site and packed into tubes, then randomly tested and timed.

7      26.     Defendants were careless in their operations, and on several occasions local fire

8  officials were called to the Site because of explosions at the Site.  Defendants often left chemicals,

9  including perchlorate, lying around without taking proper measures to secure them or arrange for

10  proper disposal.  Defendants used perchlorate continuously for over forty years, from 1956 to 1997.

11      27.     As early as 1986, Defendants knew that potassium perchlorate had contaminated the

12  soil in the ground below and around the Site.  Soil borings drilled along the Site property line

13  indicated the presence of perchlorate in the soil up to one hundred ppb.

14      28.     In 1987, Olin closed the evaporation pond into which perchlorate had been dumped.

15  The evaporation pond was drained and the perchlorate contaminated soil was spread out onto the

16  property, creating a perchlorate leach field.

17      29.     In 1997, Defendants began to demolish and remove the buildings and structures at the

18  Site.  Between 1997 and 1998, Defendants razed the structures, and removed underground storage

19  tanks.  Defendants disposed of over one thousand tons of waste, and in the process Defendants

20  indicated they would evaluate the soil and the groundwater at the Site.  By this time, perchlorate was

21  not only a known toxic chemical, but several perchlorate contamination problems had become public

22  in the United States.

23      30.     By 1997, several groundwater contamination sites involving perchlorate were

24  specifically known throughout California.  Certainly Olin, a chemical manufacturer, knew or should

25  have known by this time that perchlorate was a dangerous chemical if ingested and that it created

26  health risks if allowed to seep into groundwater.

27

28

COMPLAINT

7

31.     Indeed, as an industrial company founded in 1892, Olin has owned sites where contamination occurred and chemicals needed to be cleaned out of soil and groundwater. Some of these waste sites were located at other Olin manufacturing locations.

32.     Notwithstanding their specialized knowledge of chemicals like perchlorate, and notwithstanding their experience in the remediation of toxic waste sites, Defendants were negligent and careless in their handling of perchlorate, in violation of state and federal laws, and did nothing to remove the perchlorate contamination from the Site after demolishing the structures and closing the facility. In fact, the contamination at the Site remains there today.

**C.     Notice and Discovery of Contamination**

33.     Defendants did not disclose any possible contamination problems to the public or their neighbors before or after they abandoned the Site. It was not until due diligence was performed by a potential purchaser of the Site in late 2000 that Olin notified the County of Santa Clara and the State of California that perchlorate existed in soil and groundwater at the Site. Further investigation by regulatory agencies led to the detection of perchlorate at three on site monitoring wells in October, 2000.

34.     After notifying the Central Coast Regional Water Quality Control Board ("RWQCB") of the existence of perchlorate in the groundwater, the RWQCB ordered Olin to conduct further site testing and to test a nearby municipal well used by the City of Morgan Hill. Tests of this Morgan Hill well were conducted in July, October and December, 2001, and again in March, 2002. The current California "action level" for perchlorate is four ppb. Once perchlorate is detected in quantities at or above four ppb, a well sampled with this quantity must be closed.

35.     The March, 2002 test of the Morgan Hill well, located 250 feet southwest of the Site, revealed the presence of perchlorate in excess of the four ppb action level, and Morgan Hill was accordingly forced to close the municipal well. That well provided drinking water to a large portion of the residents of Morgan Hill.

36.     Further investigation and analysis by the RWQCB, the California Department of Health and the Santa Clara Valley Water District ("SCVWD") led these agencies to conduct further testing of wells around the Site. Additional off-site residential wells in San Martin were tested in the

1  fall of 2002. By the end of 2002, the regulatory agencies and health officials became increasingly

2  concerned about the extent of the contamination in the community and the potential health effects of

3  the perchlorate contamination.

4        37.    In January, 2003, the SCVWD and the RWQCB selected three dozen additional wells

5  in the Morgan Hill and San Martin communities to test for perchlorate contamination. At that time

6  the SCVWD began to notify affected San Martin residents of the contamination in the local drinking

7  water supply.

8        38.    On January 15, 2003, Olin admitted to the public, for the first time, that there was a

9  widespread contamination problem. A news conference was held the following day, at which the

10  SCVWD announced the existence of significant plume of perchlorate under the San Martin

11  community resulting from the Site. The SCVWD immediately began to offer free testing of well

12  water to residents of San Martin.

13        39.    Testing of the San Martin area continues at present. The plume, as now

14  characterized, extends seven miles in the groundwater basin. Water is no longer available for

15  drinking at public schools. Fountains in local parks have been shut down. Families throughout San

16  Martin are forced to drink water from a cooler or bottles. Homeowners and residents have to avoid

17  brushing their teeth with water from their sinks. Cooking or boiling perchlorate only intensifies its

18  concentration, so residents cannot use their water for cooking or making coffee or tea.

19        40.    Various agencies and officials have confirmed that the perchlorate dumped by

20  Defendants has migrated South and North of the Site, and has contaminated hundreds of wells in San

21  Martin and Morgan Hill. Perchlorate has been allowed to continue to migrate into and contaminate

22  the aquifer below San Martin, and specifically the water and soil on which the Palmisanos' property

23  is located.

24        41.    In or about January, 2003, the Palmisanos first discovered that the sole drinking water

25  supply for their property was contaminated with potassium perchlorate which had migrated to their

26  property, through the underground aquifer, from the Site. The Palmisanos did not and could not

27  have discovered the improper and illegal conduct of Defendants, and the damage to their property,

28  until January, 2003, when they learned from the SCVWD that the district was investigating the

COMPLAINT

9

1  possible contamination of their property.  Prior to that date the Palmisanos did not and could not

2  have known of the damage to their property and the accrual of their claims against the Defendants,

3  as set forth herein.

4       42.    As soon as the Palmisanos become aware of the contamination, in or about January,

5  2003, the Palmisanos were required, under California law, to disclose the existence of the plume and

6  the presence of perchlorate on their property and/or in their community to potential buyers of their

7  property, real estate lenders, mortgage companies and the like.

8       43.    Were it not for the presence of contaminants in the property, the Palmisanos' real

9  property would have increased in its fair market value.  The Palmisanos made substantial

10  investments in their property, which they made in good faith reliance that the property was free from

11  contamination.

12       44.    As a proximate result of Defendants' acts and omissions, the Palmisanos have

13  suffered damages, including, but not limited to, an interference with the Palmisanos' use of their

14  residential property, a diminution in the value of their property, damages due to the stigma caused by

15  the contamination of the groundwater basin, and substantial consequential costs and expenses.

16       45.    As a further proximate result of Defendants' acts and omissions, the Palmisanos have

17  suffered emotional distress as a result of concerns over their exposure to perchlorate.  The

18  Palmisanos fear for the safety and health of themselves and their family.  As a result of such injuries,

19  the Palmisanos have suffered general damages in an amount according to proof.

20       46.    In engaging in the acts set forth above, Defendants each were guilty of malice, fraud,

21  and oppression as defined in California Civil Code § 3294, and the Palmisanos should recover, in

22  addition to actual damages, damages to make an example of and punish Defendants, in an amount to

23  be determined.

**FIRST CAUSE OF ACTION**
**(Negligence)**

24

25       47.    The Palmisanos reallege and incorporate, as though fully set forth herein, each and

26  every allegation in paragraphs 1 through 46 of this complaint.

27       48.    As owners, operators and managers of the Site, and while owning, occupying and

28  conducting operations at the Site, Defendants owed a duty at all times to the Palmisanos, the public,

COMPLAINT

1  and neighboring land owners to exercise due care in controlling, monitoring, maintaining and

2  operating the Site, and in collecting, using, storing, disposing of, and causing to be disposed of

3  chemicals, contaminants and hazardous substances, including potassium perchlorate, used in or

4  produced by the manufacturing process. At all times relevant herein, Defendants specifically had a

5  duty to prevent and avoid the discharge and release of potassium perchlorate into the environment.

6       49.    Defendants negligently failed to exercise their duty of due care in controlling,

7  monitoring, maintaining and operating the Site, and in collecting, using, storing, disposing of, and

8  causing to be disposed of chemicals, contaminants and hazardous substances, including potassium

9  perchlorate, used in or produced by the manufacturing process at the Site by disposing of,

10  discharging, depositing, releasing and allowing the release of such chemicals, contaminants and

11  hazardous substances into the groundwater basin, the local water supply, surface and subsurface soil

12  and the environment in and around the Site, and ultimately the Palmisanos' property, by improperly

13  and negligently using, storing and disposing of chemicals, contaminants and hazardous substances,

14  including potassium perchlorate.

15       50.    Defendants knew or should have known that that their failure to use reasonable care

16  in controlling, monitoring, maintaining and operating the Site, and in collecting, using, storing,

17  disposing of, and causing to be disposed of chemicals, contaminants and hazardous substances,

18  including potassium perchlorate, did cause and continues to cause the groundwater basin, the local

19  water supply, surface and subsurface soil and the environment in and around the Site, and ultimately

20  the Palmisanos' property, to be contaminated with chemicals, contaminants and hazardous

21  substances, including potassium perchlorate. Defendants never warned the Palmisanos about any of

22  their tortious conduct.

23       51.    As a direct and proximate result of Defendants' negligence and breach of duty, the

24  Palmisanos have suffered and will continue to suffer consequential, incidental and general damages,

25  in amounts to be proven at trial. Such damages include, but are not limited to, physical, mental,

26  emotional and nervous distress and pain and suffering, including fear of cancer, as a result of the

27  Palmisanos' exposure to chemicals, contaminants and hazardous substances, including potassium

28  perchlorate.

COMPLAINT

52.    Defendants' actions in failing to disclose, fraudulently misrepresenting and deceiving the Palmisanos and the public about the existence of potassium perchlorate and other chemicals, contaminants and hazardous substances in the groundwater basin, the local water supply, surface and subsurface soil and the environment in and around the Site, and ultimately the Palmisanos' property, were willful, malicious, and intentional, from which the Palmisanos have suffered great harm. Moreover, Defendants consistently failed to disclose to the Palmisanos and the public, although required to do so, that ingestion of potassium perchlorate and other toxic substances was harmful to their health. Defendants' wrongful conduct was knowing and deliberate, and Defendants acted with conscious and reckless disregard of the hazards and threats to the Palmisanos and the public.

53.    Defendants' conduct was outrageous, willful, malicious and intentional, causing the Palmisanos' great and irreversible harm, and thus entitling the Palmisanos to recover punitive and exemplary damages from Defendants.

## SECOND CAUSE OF ACTION
### (Negligence *Per Se*)

54.    The Palmisanos reallege and incorporate, as though fully set forth herein, each and every allegation in paragraphs 1 through 53 of this complaint.

55.    Defendants' conduct, including their failure to exercise due care and improperly and negligently collecting, using, storing, disposing of, and causing to be disposed of chemicals, contaminants and hazardous substances, including potassium perchlorate, and by disposing of, discharging, depositing, releasing and allowing the release of potassium perchlorate into the groundwater basin, the local water supply, surface and subsurface soil and the environment in and around the Site, and ultimately the Palmisanos' property, violated various state and federal statutes, rules and regulations which set a standard of care and conduct intended to protect the Palmisanos, their property and others similarly situated, and the local environment, from the type of improper activities engaged in by Defendants. Therefore, such improper activities and violations of law constitute negligence *per se*.

56.    As owners, operators and managers of the Site, Defendants specifically violated the provisions of California Health and Safety Code § 5411, which provides that "no person shall

COMPLAINT

discharge sewage or other waste, or the effluent of treated sewage or other waste, in any manner which will result in contamination, pollution or a nuisance." Defendants further violated the provisions of California Water Code §§ 13000 et seq., and in particular Section 13350, which statute provides that "Any person who, without regard to intent or negligence, causes or permits any hazardous substance to be discharged in or on any of the waters of the state where it creates a condition of pollution or nuisance, . . . shall be strictly liable civilly . . ." As defined by California Water Code § 13050(k), Defendants have contaminated the quality of water in the area through their improper disposal of potassium perchlorate and other toxic substances.

57.     The violation of California Health and Safety Code § 5411 and California Water Code §§ 13000 et. seq. by Defendants proximately caused trespass and nuisance to the Palmisanos' property, including diminution in value to the property, and caused further consequential, incidental and general damages to the Palmisanos.

58.     California Water Code §§ 13000 et. seq., including Section 13241, and California Health and Safety Code § 5411 were intended to prevent this type of injury to the Palmisanos and to their property, and the Palmisanos are members of the class of persons for whose protection these statutes were adopted.

59.     As a proximate result of Defendants' violations of the statutes set forth herein, and negligence *per se*, the Palmisanos have suffered and will continue to suffer consequential, incidental and general damages, in amounts to be proven at trial. Such damages include, but are not limited to, physical, mental, emotional and nervous distress and pain and suffering, including fear of cancer, as a result of the Palmisanos' exposure to chemicals, contaminants and hazardous substances, including potassium perchlorate.

60.     Defendants' actions in failing to disclose, fraudulently misrepresenting and deceiving the Palmisanos and the public about the existence of potassium perchlorate and other chemicals, contaminants and hazardous substances in the groundwater basin, the local water supply, surface and subsurface soil and the environment in and around the Site, and ultimately the Palmisanos' property, were willful, malicious, and intentional, from which the Palmisanos have suffered great harm. Moreover, Defendants consistently fail to disclose to the Palmisanos and the public, although

1   required to do so, that ingestion of potassium perchlorate and other chemicals, contaminants and

2   hazardous substances was harmful to their health.  Defendants' wrongful conduct was knowing and

3   deliberate, and Defendants acted with conscious and reckless disregard of the hazards and threats to

4   the Palmisanos and the public.

5       61.   Defendants' conduct was outrageous, willful, malicious and intentional, causing the

6   Palmisanos great and irrefutable harm, and thus entitling the Palmisanos to recover punitive and

7   exemplary damages from Defendants.

8                       **THIRD CAUSE OF ACTION**

9                   **(Strict Liability for Ultra Hazardous Activity)**

10      62.   The Palmisanos reallege and incorporate, as though fully set forth herein, each and

11  every allegation in paragraphs 1 through 61 of this complaint.

12      63.   Defendants knew or should have known that that their failure to use reasonable care

13  in controlling, monitoring, maintaining and operating the Site and in collecting, using, storing,

14  disposing of, and causing to be disposed of chemicals, contaminants and hazardous substances,

15  including potassium perchlorate, would create and has created actual harm to the persons, animals

16  and land of others, including the Palmisanos, from the resulting contamination of the groundwater

17  basin, the local water supply, surface and subsurface soil and the environment in and around the Site,

18  and ultimately the Palmisanos' property.  Defendants knew or should have known that there existed,

19  and still exists, a certainty of harm to others, including the Palmisanos, that would result from the

20  disposing of, discharging, depositing, releasing and allowing the release of these chemicals,

21  contaminants and hazardous substances, including potassium perchlorate, into the groundwater

22  basin, the local water supply, surface and subsurface soil and the environment in and around the Site,

23  and ultimately the Palmisanos' property.

24      64.   Defendants' disposal, discharge, depositing and release of chemicals, contaminants

25  and hazardous substances, including potassium perchlorate, onto and into the groundwater basin, the

26  local water supply, surface and subsurface soil and the environment in and around the Site, and

27  ultimately the Palmisanos' property, constitutes and is an ultra hazardous activity.

28

COMPLAINT

65.    As a direct and proximate result of the disposal, discharge, depositing, storage and release of chemicals, contaminants and hazardous substances, including potassium perchlorate, the Palmisanos have suffered and will continue to suffer consequential, incidental and general damages to be proven at trial, for which Defendants are strictly liable.  Such damages include, but are not limited to, physical, mental, emotional and nervous distress and pain and suffering, including fear of cancer, as a result of the Palmisanos' exposure to chemicals, contaminants and hazardous substances, including potassium perchlorate.

66.    Defendants' actions in failing to disclose, fraudulently misrepresenting and deceiving the Palmisanos and the public about the existence of potassium perchlorate and other chemicals, contaminants and hazardous substances in the groundwater basin, the local water supply, surface and subsurface soil and the environment in and around the Site, and ultimately the Palmisanos' property, were willful, malicious, and intentional, from which the Palmisanos have suffered great harm. Moreover, Defendants consistently failed to disclose to the Palmisanos and the public, although required to do so, that ingestion of potassium perchlorate and other chemicals, contaminants and hazardous substances was harmful to their health.  Defendants' wrongful conduct was knowing and deliberate, and Defendants acted with conscious and reckless disregard of the hazards and threats to the Palmisanos and the public.

67.    Defendants' conduct was outrageous, willful, malicious and intentional, causing the Palmisanos great and irrefutable harm, and thus entitling the Palmisanos to recover punitive and exemplary damages from Defendants.

## FOURTH CAUSE OF ACTION
### (Trespass)

68.    The Palmisanos reallege and incorporate, as though fully set forth herein, each and every allegation in paragraphs 1 through 67 of this complaint.

69.    Defendants' disposal, discharge, depositing, dumping, abandonment and release of chemicals, contaminants and hazardous substances, including potassium perchlorate, has intruded upon the property of the Palmisanos in such a manner as to cause a physical invasion of the

COMPLAINT

15

1   Palmisanos' property and to interfere with the Palmisanos' possession, use and enjoyment of their

2   property, thereby constituting a trespass.

3       70.    Defendants intentionally collected, used, stored, released, abandoned, disposed of,

4   and caused to be disposed of chemicals, contaminants and hazardous substances, including

5   potassium perchlorate, into the groundwater basin, the local water supply, surface and subsurface

6   soil and the environment in and around the Site, and ultimately the Palmisanos' property, without the

7   authority or permissions of the Palmisanos.  Defendants' conduct has been and continues to be

8   carried out with a conscious disregard of the Palmisanos' right to the use and enjoyment of their

9   property.

10      71.    The contamination in the soil and groundwater in the area in, under and around the

11  Palmisanos' property is migrating and will continue to migrate.  As the contaminants migrate, the

12  damage to the property worsens and will continue to worsen into the future.  Accordingly, as a result

13  of Defendants' disposal, discharge, depositing, dumping, abandonment and release of chemicals,

14  contaminants and hazardous substances, including potassium perchlorate, the contamination

15  currently existing in the soil and groundwater under the Palmisanos' property cannot be reasonably

16  abated, remediated or cleaned up by Defendants or other entities, and constitutes a permanent

17  trespass to the Palmisanos' property.

18      72.    As a direct and proximate result of the intentional disposal, discharge, depositing,

19  dumping, abandonment and release of chemicals, contaminants and hazardous substances, including

20  potassium perchlorate, by Defendants onto the Palmisanos' property, the Palmisanos have suffered

21  and will continue to suffer consequential, incidental and general damages, in amounts to be proven

22  at trial.  Such damages include, but are not limited to, physical, mental, emotional and nervous

23  distress and pain and suffering, including fear of cancer, as a result of the Palmisanos' exposure to

24  chemicals, contaminants and hazardous substances, including potassium perchlorate.

25      73.    Defendants' conduct was outrageous, willful, malicious and intentional, causing the

26  Palmisanos great and irrefutable harm, and thus entitling the Palmisanos to recover punitive and

27  exemplary damages from Defendants.

28

COMPLAINT

# FIFTH CAUSE OF ACTION
## (Private Nuisance)

74. The Palmisanos reallege and incorporate, as though fully set forth herein, each and every allegation in paragraphs 1 through 73 of this complaint.

75. The Palmisanos are informed and believe, and on that basis allege, that as a direct and proximate result of Defendants' disposal, discharge, depositing, dumping, abandonment and release of chemicals, contaminants and hazardous substances, including potassium perchlorate, into the groundwater basin, the local water supply, surface and subsurface soil and the environment in and around the Site, and ultimately the Palmisanos' property, Defendants are interfering with and precluding the Palmisanos' free use and enjoyment of their property, and are threatening to impair and injure the health of the Palmisanos and other individuals who would conduct business, visit or otherwise utilize the property.

76. Defendants' disposal, discharge, depositing, dumping, abandonment and release of chemicals, contaminants and hazardous substances, including potassium perchlorate, onto the Palmisanos' property has caused and is causing injury to the property and to the Palmisanos.  The Palmisanos did not ever authorize, sanction or agree to Defendants' disposal, discharge, depositing, dumping, abandonment and release of chemicals, contaminants and hazardous substances, including potassium perchlorate.

77. The contamination in the soil and groundwater in the area in, under and around the Palmisanos' property is migrating and will continue to migrate.  As the contaminants migrate, the damage to the property worsens and will continue to worsen into the future.  Accordingly, as a result of Defendants' disposal, discharge, depositing, dumping, abandonment and release of chemicals, contaminants and hazardous substances, including potassium perchlorate, the contamination currently existing in the soil and groundwater under the Palmisanos' property cannot be reasonably abated, remediated or cleaned up by Defendants or other entities, and constitutes a permanent, private nuisance.

78. Defendants' disposal, discharge, depositing, dumping, abandonment and release of chemicals, contaminants and hazardous substances, including potassium perchlorate, into the

1   groundwater basin, the local water supply, surface and subsurface soil and the environment in and

2   around the Site, and ultimately the Palmisanos' property, and the resultant permanent nuisance, has

3   directly and proximately caused damages to the Palmisanos, including, but not limited to, a decrease

4   and diminution in the value of the Palmisanos' property as a result of the contaminated water supply

5   for the property, and undetermined damages due to the stigma caused by the contamination of the

6   groundwater basin, the local water supply, surface and subsurface soil, the environment in and

7   around the Site, and the Palmisanos' property, which condition has impaired the Palmisanos' ability

8   to sell or secure a loan against their property, and the uncertainty regarding future contamination and

9   damages, as well as other damages set forth above, including other consequential, incidental and

10  general damages to be proven at trial.

11      79.    Defendants' conduct was outrageous, willful, malicious and intentional, causing the

12  Palmisanos great and irrefutable harm, and thus entitling the Palmisanos to recover punitive and

13  exemplary damages from Defendants.

## SIXTH CAUSE OF ACTION
### (Public Nuisance)

16      80.    The Palmisanos reallege and incorporate, as though fully set forth herein, each and

17  every allegation in paragraphs 1 through 79 of this complaint.

18      81.    Defendants' disposal, discharge, depositing, dumping, abandonment and release of

19  chemicals, contaminants and hazardous substances, including potassium perchlorate, into the

20  groundwater basin, the local water supply, surface and subsurface soil and the environment in and

21  around the Site, and ultimately the Palmisanos' property, gives rise to a public nuisance that affects

22  not only the Palmisanos but the entire communities of San Martin, Morgan Hill and the surrounding

23  area. Because the chemicals, contaminants and hazardous substances, including potassium

24  perchlorate, have spread and threaten to continue to spread from the Site to adjacent properties,

25  including under public streets and sidewalks, and have polluted the groundwaters of the State of

26  California, it is of great public concern. The chemicals, contaminants and hazardous substances,

27  including potassium perchlorate in, under and around the Palmisanos' property substantially

28

COMPLAINT

18

1  devalues the property, and have caused the Palmisanos monetary damages, and the Palmisanos have

2  therefore suffered injuries different in kind from those suffered by the general public.

3      82.    The Palmisanos, in their capacity as Private Attorney Generals, allege that as a

4  proximate result of the chemicals, contaminants and hazardous substances, including potassium

5  perchlorate, having been released and discharged onto their property, the property has been

6  permanently damaged.  Defendants' disposal, discharge, depositing, dumping, abandonment and

7  release of chemicals, contaminants and hazardous substances, including potassium perchlorate, into

8  the groundwater basin, the local water supply, surface and subsurface soil and the environment in

9  and around the Site, and ultimately the Palmisanos' property, and the resultant permanent nuisance,

10  has directly and proximately caused damages to the Palmisanos, including, but not limited to, a

11  decrease and diminution in the value of the Palmisanos' property as a result of the contaminated

12  water supply for the property, and undetermined damages due to the stigma caused by the

13  contamination of the groundwater basin, the local water supply, surface and subsurface soil, the

14  environment in and around the Site, and the Palmisanos' property, which condition has impaired the

15  Palmisanos' ability to sell or secure a loan against their property.  At the same time, the releases and

16  discharges of chemicals, contaminants and hazardous substances, including potassium perchlorate,

17  by Defendants has affected the entire community and the comfort, convenience and health of a

18  considerable number of persons, although the extent of the annoyance, danger, and damage inflicted

19  upon the residents of the surrounding communities may be unequal.

20      83.    The Palmisanos, in their capacity as Private Attorney Generals, assert that their action

21  against Defendants (a) raises strong issues of public importance and policy which are in need of

22  vindication by legal action; (b) presents the necessity for private enforcement of said issues and

23  rights, the resulting burden of which falls on the Palmisanos; and (c) will benefit the health and

24  safety of the community.

25      84.    The Palmisanos, as Private Attorney Generals, demand that they recover their

26  reasonable attorneys' fees and costs incurred in prosecuting this action.

27

28

COMPLAINT

85.    Defendants' conduct was outrageous, willful, malicious and intentional, causing the Palmisanos great and irrefutable harm, and thus entitling the Palmisanos to recover punitive and exemplary damages from Defendants.

## SEVENTH CAUSE OF ACTION
### (Intentional and Negligent Infliction of Emotional Distress)

86.    The Palmisanos reallege and incorporate, as though fully set forth herein, each and every allegation in paragraphs 1 through 85 of this complaint.

87.    Defendants' conduct in controlling, monitoring, maintaining and operating the Site and in collecting, using, storing, disposing of, and causing to be disposed of chemicals, contaminants and hazardous substances, including potassium perchlorate, used in or produced by the manufacturing process at the Site by disposing of, discharging, depositing, releasing and allowing the release of such chemicals, contaminants and hazardous substances into the groundwater basin, the local water supply, surface and subsurface soil and the environment in and around the Site, and ultimately the Palmisanos' property, was intentional, malicious and negligent and done with the purpose of causing the Palmisanos and members of the public mental and emotional anguish, and mental, emotional and physical distress, or, in the alternative, done with reckless disregard for the health and well being of the Palmisanos and members of the public.

88.    As a proximate result of the aforementioned acts, the Palmisanos suffered mental and emotional anguish and mental, emotional and physical distress, consisting of general illness, loss of sleep and nervous anxiety.  Specifically, as a result of Defendants' breach of duty, trespass and improper conduct, the Palmisanos were exposed to toxic substances, including potassium perchlorate, that threaten cancer, and the Palmisanos' fear stems from the knowledge, corroborated by reliable medical and scientific opinion, that it is more likely than not that the Palmisanos will develop diseases, including cancer, in the future due to the exposures caused by Defendants, or that the toxic exposure caused by Defendants has significantly increased the risk of disease and/or cancer to the Palmisanos.

89.    Defendants' conduct was outrageous, willful, malicious and intentional, causing the Palmisanos great and irreversible harm, and thus entitling the Palmisanos to recover punitive and exemplary damages from Defendants.

## EIGHTH CAUSE OF ACTION
### (Damages Under CERCLA)

90.    The Palmisanos reallege and incorporate, as though fully set forth herein, each and every allegation in paragraphs 1 through 89 of this complaint.

91.    The chemicals which Defendants stored, used, released, and discharged on the Site are classified as hazardous substances under the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601, et seq. and specifically 42 U.S.C. § 9601(14), and applicable regulations thereunder.

92.    Defendants were "owners" and/or "operators" on the Site, as defined by CERCLA, 42 U.S.C. § 9601(20), from 1956 to 1997.  While Defendants were owners and/or operators on the Site, significant quantities of hazardous substances, including potassium perchlorate, were disposed of, discharged, deposited, dumped, abandoned and released into the soil and groundwater in and around the Site, causing these hazardous substances to enter the groundwater basin, the local water supply, surface and subsurface soil and the environment in and around the Site.  Defendants' activities on the Site therefore resulted in the "release" and "disposal" of hazardous substances within the meaning of CERCLA, 42 U.S.C. §§ 9601(22) and (29).

93.    The Site, including the buildings and structures thereon, constitute a "facility" as defined by CERCLA, 42 U.S.C. § 9601(9).  All of the Defendants are "covered persons" within the meaning of that term under CERCLA, 42 U.S.C. § 9607(a).

94.    As a proximate result of Defendants' release of the hazardous substances into the soil and groundwater located beneath the Site, the Palmisanos have had to incur necessary response costs, including costs to assess and investigate the nature and extent of the contamination, costs related to remedial action, including enforcement activities related thereto, consisting of, among other things, expert and attorneys' fees.

COMPLAINT

95.     The Palmisanos' response to the contamination, including their investigation and response to the contamination, has, in all respects, been in compliance with the National Contingency Plan ("NCP"), as provided for in 42 U.S.C. §§ 9605 and 9607(a)(4)(B) and 40 C.F.R. § 300, et seq.

96.     The Palmisanos seek reimbursement and/or contribution from Defendants, and each of them, pursuant to 42 U.S.C. §§ 9607(a) and 9613(f), for all response and remedial costs that the Palmisanos have incurred and will incur related to the hazardous substances that Defendants released onto the Site, and eventually the Palmisanos' property, and which were released while Defendants were operators and owners on the Site.

97.     The Palmisanos have incurred substantial and necessary response costs, including investigatory expenses, attorneys' fees, consulting fees, oversight costs, interest and other response costs, and will continue to incur costs in the future.

## NINTH CAUSE OF ACTION
### (Declaratory Relief under CERCLA)

98.     The Palmisanos reallege and incorporate, as though fully set forth herein, each and every allegation in paragraphs 1 through 97 of this complaint.

99.     Because the extent and magnitude of the contamination at the Site, and the Palmisanos' property, is not fully known at this time, and because the contamination has not yet begun to be mitigated, and is not capable of being fully mitigated in the future, the Palmisanos will incur necessary response costs, including, but not limited to, investigatory and remedial expenses, attorneys' fees and interest in the future.

100.    Pursuant to 42 U.S.C. § 9613(g)(2), the Palmisanos are entitled to a declaratory judgment establishing the liability of the Defendants, and each of them, for such response costs for the purposes of this and any subsequent action or actions to recover further response costs.

## PRAYER FOR RELIEF

WHEREFORE, the Palmisanos pray for relief as follows:

1.      For general, consequential and incidental damages in amounts to be proven at trial for negligence, negligence *per se*, trespass, private nuisance, public nuisance, and intentional and

1  negligent infliction of emotional distress caused by Defendants for harm to the Palmisanos' property,

2  loss of use and enjoyment of the property, and diminution in value to the property;

3     2.    For general, consequential and incidental damages, in amounts to be proven at trial,

4  caused by Defendants' ultra hazardous activity;

5     3.    For contribution, damages and/or restitution under CERCLA, for past and future

6  response costs, including reasonable attorneys' fees, expert witness fees, oversight costs and interest

7  incurred by the Palmisanos to investigate and respond to the contamination at the Site and on their

8  property, in an amount to be proven at trial;

9     4.    For a judicial declaration under CERCLA that all Defendants, and each of them, are

10 liable for future response costs, including reasonable attorneys' fees, expert witness fees, oversight

11 costs and interest incurred by the Palmisanos to investigate and remedy the contamination at the Site

12 and on the Palmisanos' property;

13    5.    For general, consequential and incidental damages related to emotional and mental

14 pain and distress suffered by the Palmisanos as a result of the conduct of Defendants;

15    6.    For punitive and exemplary damages;

16    7.    For costs of suit incurred herein, including reasonable attorneys' fees; and

17    8.    For such other and further relief as the Court may deem proper.

18

19 DATED: April 15, 2003                    RAPAZZINI & GRAHAM, LLP

20

21                                          By: _M. Elizabeth Graham_
                                            MARK P. RAPAZZINI
22                                          M. ELIZABETH GRAHAM

23

24                                          DUANE MORRIS LLP

25

26 DATED: April 15, 2003                    By: _Colin L. Pearce_
                                            COLIN L. PEARCE
27
                                            Attorneys for Plaintiffs
28                                          JANE PALMISANO and RICHARD
                                            PALMISANO

# DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure and United States District Court for the Northern District of California Local Rule 3-6, the Palmisanos hereby demand a jury trial.

DATED:  April 15, 2003                     RAPAZZINI & GRAHAM, LLP


By: _M. Elizabeth Graham_____
      MARK P. RAPAZZINI
      M. ELIZABETH GRAHAM


DUANE MORRIS LLP


DATED:  April 15, 2003                     By: _Colin L. Pearce_____
      COLIN L. PEARCE

Attorneys for Plaintiffs
JANE PALMISANO and RICHARD PALMISANO

SF\38606.1