MORGAN, LEWIS & BOCKIUS LLP
MICHAEL E. MOLLAND, State Bar No. 111830
BENJAMIN P. SMITH, State Bar No. 197551
AARON S. DUTRA, State Bar No. 216971
SETH A. MCGIBBEN, State Bar No. 227261
One Market, Spear Street Tower
San Francisco, CA 94105
Telephone: (415) 442-1000
Facsimile: (415) 442-1001
E-mail: mmolland@morganlewis.com
        bpsmith@morganlewis.com
        asdutra@morganlewis.com
        smcgibben@morganlewis.com

CREECH, LIEBOW & KRAUS
RANDALL C. CREECH, State Bar No. 65542
333 West San Carlos Street, Suite 1600
San Jose, CA  95110
Telephone: (408) 993-9911
Facsimile:  (408) 993-1335
E-mail:  rcreech@sjlegal.com

Attorneys for Counter-Claimant
OLIN CORPORATION

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| OLIN CORPORATION<br><br>          Counter-Claimant,<br><br>      vs.<br><br>SANTA CLARA VALLEY WATER DISTRICT; and DOES 1-10,<br><br>       Counter-Defendants. | Case No. C 07-03756 RMW<br><br>**OLIN CORPORATION'S COUNTERCLAIM**<br>**(JURY TRIAL DEMAND)** |

Counter-Claimant OLIN CORPORATION ("Olin") alleges as follows:

## INTRODUCTION

1.     The Llagas groundwater basin ("Llagas Sub-basin") underlies South Santa Clara County extending south from the Anderson Reservoir dam to the Pajaro River, just south of Gilroy, California.  To date, Olin has paid over $35 million to respond to findings of

perchlorate in the Llagas Sub-basin including perchlorate detected upgradient from Olin's former facility at 425 Tennant Avenue in Morgan Hill, CA.

2.     Since at least 1960, the Santa Clara Valley Water District (the "District") has owned and operated facilities in and around the Llagas Sub-basin. These facilities include the Anderson Reservoir, Main Avenue and Madrone percolation ponds (the "Percolation Ponds") through which the District injected billions of gallons of untreated water from the Anderson Reservoir into the basin. The facilities of and actions by the District have also contributed to the presence of perchlorate in the Llagas Sub-basin.

3.     The District has stored water from the Las Animas Creek Watershed in the Anderson Reservoir since 1950. Since 1960, United Technologies Corporation ("UTC") has owned and operated the Chemical Systems Division (CSD), where solid rocket fuels and rocket motors were developed, manufactured, and tested ("UTC Site"). This 5,200 acre site lies within the Las Animas Creek Watershed, which drains into the adjacent Anderson Reservoir. The UTC Site extends to within 500 feet upstream of the Anderson Reservoir. Operations ceased in 2005. The rocket fuel used by UTC consisted principally of ammonium perchlorate. Since the 1960s, the UTC plant disposed of millions of pounds of perchlorate in and around the watershed of the Las Animas Creek. This perchlorate dissolved in both surface water and groundwater and reached the Anderson Reservoir, which recharges the Llagas Sub-basin basin via underflow from it and historical District conveyances to the Percolation Ponds.

4.     The District has been aware of UTC's use of perchlorate from the very beginning of the operations at UTC facilities in the early 1960s. The District was involved in and commented upon the initial permitting of the UTC operations in 1960. The District did not then oppose the construction and operations of the UTC facilities. Other California state health agencies, however, expressed concern in 1960 that unless precautions were taken, contamination of the Anderson Reservoir would occur from expected UTC operations.

5.     The fears of these other State of California Health agencies were justified. In

2

the late 1970s and 1980s, extensive surface water and groundwater contamination was discovered and the UTC Site became subject to extensive investigation and remediation. The initial investigation focused on the volatile organic chemicals found in water at the UTC Site. Later it was disclosed that millions of pounds of perchlorate had been disposed of on or near the UTC facility leading to discharges into tributaries of the Anderson Reservoir. Testing of the UTC Site showed some of the highest concentrations of perchlorate in soil and groundwater ever recorded in California. The UTC Site is now under continuing investigation and remediation for the volatile organic chemicals and perchlorate. However, UTC's use and disposal for perchlorate had occurred for decades before any investigation and remediation of it was begun by UTC or others.

6. During this entire time, the District continued to store water in the Anderson Reservoir knowing that water discharged into the Reservoir, including from Las Animas Creek and its tributaries, originated at or beneath the UTC facility. The District injected billions of gallons of water from the Anderson Reservoir into the Llagas Sub-basin by way of conveyance to the Percolation Ponds until 1987. Test results from wells located adjacent to the Anderson Reservoir dam and Percolation Ponds now show that perchlorate distribution in the Llagas Sub-basin is connected to recharge from the Anderson Reservoir, as well as to the historical injection of the water by the District into the basin in the 1960s, 1970s and 1980s. Accordingly, Olin here seeks reimbursement from the District for costs incurred by Olin to respond to and remediate perchlorate found in the Llagas Sub-basin caused by the District's actions and facilities, as well as for Olin's future costs of response to and remediation of perchlorate in the Llagas Sub-basin and other related expenses.

## COUNTER-DEFENDANT
## SANTA CLARA VALLEY WATER DISTRICT

7. The District is a governmental entity established to, among other things, supply drinking water to residents of Santa Clara County. It regulates and issues permits for installing wells drilled in its groundwater basins, including the Llagas Sub-basin, that are used for potable, agricultural or municipal/industrial purposes. It also charges fees for property and

1    business owners who pump groundwater from their basins.

2        8.    The District's facilities include a 90,000 acre feed reservoir named Anderson

3    Reservoir, located within Santa Clara County, which is used by the District to supply drinking

4    water and other water to residents of Santa Clara County and the District also owns or operates

5    or manages numerous spreading ponds and percolation discharge points throughout Santa

6    Clara County ("District Facilities").  The District has for years used these ponds and discharge

7    points to discharge, inject, and transfer billions of gallons of water from the Anderson

8    Reservoir (and after 1987 other reservoirs) into the Llagas groundwater basin in Santa Clara

9    County, to be used for drinking water by Santa Clara County residents.

10        9.    The District's facilities and actions have caused or contributed to the presence

11    of perchlorate in the Llagas Sub-basin in Santa Clara County.

12                              **OTHER DEFENDANTS**

13        10.    Does 1-10 are as yet unidentified entities and individuals who are potentially

14    liable for the releases or threatened releases of perchlorate or other injurious conditions at

15    and emanating from District Facilities.  The true names or capacities of the defendants sued

16    under the fictitious names Does 1-10 are currently unknown to Olin.  Olin will amend this

17    Complaint to add the true names and capacities of these parties when they become known to

18    Olin.

19                              **COUNTER-CLAIMANT**

20        11.    Olin is a corporation that is organized and existing under the laws of the

21    Commonwealth of Virginia and is doing business in the State of California, including within

22    the Northern District of California.

23                              **GENERAL ALLEGATIONS**

24        12.    Perchlorate is both a naturally occurring substance and a man-made chemical.

25    Ammonium perchlorate has been and continues to be used as the oxidizer in solid rocket fuel

26    in the aerospace industry.  Potassium perchlorate is used in road flares and air bag inflation

27    systems.  One-third of all perchlorate used in the United States is used in California.  Ninety-

28    percent of California's perchlorate use is related to the aerospace industry, such as that used

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

4

1    in operations at the UTC Site.

2        13.    Olin manufactured signal flares, which contain potassium perchlorate, from

3    approximately 1956 to 1988, at a facility located at 425 Tennant Avenue, Morgan Hill, Santa

4    Clara County (the "Olin Facility"). In late 2000, Olin learned that perchlorate had been

5    detected in the ground or groundwater beneath the Olin Facility during a due diligence

6    investigation by a potential buyer of that facility. Olin promptly informed the California

7    Office of Emergency Services and the Santa Clara County Environmental Health

8    Department, as required by applicable state and local release reporting laws. In February of

9    2001, Olin also contacted the California Regional Water Quality Board which under State

10   laws is empowered to regulate such matters.

11       14.    Soon thereafter, the California Regional Water Quality Control Board,

12   Central Coast Region (the "Regional Board") took jurisdiction of this matter under the

13   California State Water Code and directed Olin to address the findings of perchlorate in the

14   groundwater through a series of orders dating from 2001 to the present. To date, Olin has

15   spent over $35 million to comply with these Regional Board orders to address the issues

16   deemed necessary by the Regional Board.

17       15.    In 2001 and 2002, Olin, as directed by the Regional Board, sampled public

18   water wells near the Olin Facility for perchlorate pursuant to Regional Board criteria.

19   Additional sampling found that one public well (the Tennant Avenue Well) had results

20   above 4 parts per billion ("ppb") perchlorate. (In February 2002, the California Department

21   of Health Services ("DHS") DHS Notification Level for perchlorate in drinking water was 4

22   ppb; it was raised to 6 ppb in March of 2004.) At its own expense, Olin drilled another

23   municipal well and donated it to the City of Morgan Hill so that the City of Morgan Hill

24   could take the Tennant Avenue Well offline. In October 2002, the Regional Board ordered

25   Olin to provide water replacement drinking water to those wells downgradient from the Olin

26   Facility which tested above the then-4 ppb Notification Level. Olin complied. There are

27   now no public or municipal wells in current production with perchlorate sampling results

28   above 6 ppb in the area.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

5

16.    Groundwater in the region typically occurs in alluvial sediments, which are underground gravel layers deposited by streambeds which flowed in the area long ago that have since been buried to various depths ranging from seven to 568 feet below ground surface.

17.    The groundwater in the Llagas Sub-basin flows predominantly from north to south, consistent with the topographic grade of the region.  Beginning in late 2003, the Regional Board also ordered Olin to conduct certain additional investigations to determine whether Olin or others were a source of perchlorate detected north (or upgradient) from the Olin Facility.  The District was aware of this order and on information and belief either directly supported its issuance or assisted others in supporting it.  To date, the Regional Board has not determined Olin to be responsible for the presence of perchlorate upgradient of the Olin Facility.  However, Olin, as required by the Regional Board, has continued to investigate the potential upgradient sources of perchlorate and has delineated perchlorate extending from the Anderson Reservoir dam throughout the northern portion of the Llagas Sub-basin.  To date, Olin has spent between one to two million dollars to investigate the presence of perchlorate upgradient from the Olin Facility.

18.    Olin, as required by the Regional Board, also has extensively investigated the presence of perchlorate in the Llagas Sub-basin downgradient from the Olin Facility.

## DISTRICT FACILITIES

19.    In 1950 the District constructed the Anderson Reservoir Dam to store water. The District has, at all times, owned or operated or managed the operations of the Anderson Dam and its reservoir and used it to supply water to Santa Clara County residents.  The original storage capacity of the reservoir was approximately 75,000 acre feet until 1997-98 when it was enlarged by the District to approximately 90,000 acre feet.  Since its construction, the amount of water stored by the District by the Anderson Reservoir in any given year has been subject to wide fluctuations.

20.    Up until approximately 1987 or thereafter, the District used water it stored in the Anderson Reservoir to replenish groundwater in the Llagas Sub-basin.  The District

1    piped water stored in the Anderson Reservoir to facilities the District had designed and

2    constructed to enhance recharge into the Llagas Sub-basin.  The principal facilities operated

3    by the District for this purpose prior to 1987 included the Percolation Ponds.  District also

4    conveyed water to ditches located along Half Road and Highway 101, northeast of Morgan

5    Hill.

6        21.    After the construction of the Percolation Ponds, the District conveyed

7    thousands of acre feet of water from the Anderson Reservoir into the basin through these

8    facilities each year.  Sometime after 1987, the District began to use water from different

9    sources for this purpose.  During the 1990's the amount of acre feet deposited by the District

10   into the Llagas Sub-basin through these spreading ponds and pits was between 5 and 10

11   thousand acre feet per year, or over one billion gallons per year.  Olin is informed and

12   believes the volume of water piped by the District from the Anderson Reservoir and injected

13   into the Llagas Sub-basin in years prior to 1987 was of similar quantity.

14       22.    After injecting water from the Anderson Reservoir through its various

15   facilities, the District billed the Santa Clara residents and agencies who pumped groundwater

16   from the basin through drinking water, agricultural, or municipal/industrial wells.  One of

17   the District's primary sources of revenue for the District is the amount of money it charges

18   well owners or groundwater users who pump groundwater from basins within Santa Clara

19   County, including the Llagas Sub-basin.

20   **UNITED TECHNOLOGIES CORPORATION**

21       23.    United Technologies Corporation ("UTC") is a corporation involved in the

22   business of manufacturing and testing solid rocket fuels and rocket motors for the aerospace

23   industry.

24       24.    Since 1960, UTC has owned and operated the Chemical Systems Division

25   ("CSD"), where solid rocket fuels and rocket motors were developed, manufactured, and

26   tested.  This 5,200 acre facility lies within the Las Animas Creek Watershed, which drains

27   into the Anderson Reservoir.  The property extends to within 500 feet upstream of the

28   Anderson Reservoir.  The facility ultimately expanded to include over 200 stations used for

laboratories, research, testing, manufacturing, storage, maintenance, and administration. The site has been under the oversight of the San Francisco Bay Regional Water Quality Control Board ("San Francisco Regional Board") since the 1960s. Operations ceased in 2005.

25. As part of its operation, the UTC Site used tens of millions of pounds of rocket fuel. The primary component of most, if not all, rocket fuel used, tested and disposed of by UTC was ammonium perchlorate. UTC also used in its operation a variety of volatile organic compounds.

**THE DISTRICT'S ROLE IN THE
PERMITTING OF UTC OPERATIONS**

26. UTC's rocket fuel operations required permits by the California Regional Water Pollution Control Board, the precursor of the San Francisco Regional Board. UTC applied for permits with the Pollution Control Board in or about 1960. As part of the process that led to the permitting of the UTC Site, on December 2, 1960, the Pollution Control Board issued a "Report on Proposed Waste Discharge" regarding the proposed UTC Site, sent it to various state and local agencies, and requested that the agencies submit comments and recommendations. The District was sent this report. In addition to the District, the San Francisco Regional Board also sent the report to the California Department of Water Resources, the California Department of Fish and Game, the California Department of Public Health, the Santa Clara County Department of Public Health, and UTC. Included with the report were attachments, including a Memorandum that identified ammonium perchlorate as a possible pollutant that would be used by UTC in its operations.

27. Also included with the "Report on Proposed Waste Discharge" sent to the District was a hydrological report conducted for UTC in 1959 by consultant Thomas Thompson. This report noted that "the entire drainage of the area is to Anderson Reservoir" and noted the presence of springs and wells on the proposed UTC Site.

28. On December 21, 1960, the District responded in writing to the proposed waste discharge at the UTC Site. In its December 21, 1960 response the District said: "The District is very much concerned about the quality of the water flowing from the watershed

areas into the Anderson Reservoir." However, the District said they then believed that "no pollution of the watershed streams will take place".

29.    Other state and local agencies, however, then stated concern about the possibility of contamination of the Anderson Reservoir by UTC operations. The California Department of Public Health ("DPH") was specifically concerned about pollution from the chemicals used at the UTC Site on human health, particularly in view of the possibility that water from the Anderson Reservoir would be widely distributed by the District's facilities. In a memorandum sent on December 20, 1960 to the Pollution Control Board as well as to the District and other state agencies, the DPH through its Engineer, G.E. Browning commented on the proposed UTC operations as follows:

> "We do note, however, some lack of information concerning the quality of industrial products to be disposed of in Liquid Test Areas in process waste disposal ponds A, B, C, D and E. It is our understanding that perchlorate is used for oxidants and other compounds are used for solid fuels. It is expected that some type of hydrocarbon distillates will be involved. Anderson Lake may become an integral part of a domestic water supply watershed area if, and when, the Santa Clara County Water Conservation District builds their cross-county water transmission line to provide domestic water from Coyote Canal. We look with concern on the possibility of phenolic or other objectionable chemical pollution of this reservoir which could adversely affect the quality of water and increase water treatment costs to consumers."

30.    In a later memorandum dated December 30, 1960, the DPH, through Mr. Browning, commented on the hydrological report submitted by Mr. Thompson as follows:

> "In addition to our concern for the possibility of overflow of industrial wastes to surface flow we should probably be concerned with pollution of the underground storage by industrial waste chemicals which could conceivably travel. If this is true, then the chemicals in the liquid wastes which may seep into the ground will undoubtedly reach Anderson Lake."

Among the conclusions that Browning reached was the following:

> "In lieu of information on the possible taste, odor, physiological or other effects of polybutadienes, polyurethanes, polyglycols, isocyanates, perchlorates or their stabilized end products, or perchlorethylene on humans, animals, fish or plants, or the estimates of the amounts or strengths of these compounds to expect from the process, it must be expected that research on such matters would be too late to prevent pollution or contamination were it to result from this proposed discharge."

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

9

Therefore, Browning recommended that:

> "All process waste disposal ponds in the Liquid Test Area be so constructed with an impervious lining that no seepage will take place which might enter the ground water basin. This would, in essence be requiring that disposal be by evaporation or hauling off the watershed under regulations of the Regional Water Pollution Control Board and the Santa Clara County Health Department."

31.    In October of 1961, the disposal of chemicals, including perchlorate, at the UTC Site was the subject of a meeting between the Pollution Control Board and UTC.  A memorandum written by Pollution Control Board Executive Director, John B. Harrison, details the discussion, which references the amount of perchlorate waste expected to be generated at the UTC Site and discusses the possibility of disposing of this perchlorate at sea.  It was recognized then that perchlorate was extremely soluble in water.

32.    About the same time, in October of 1961, Robert Scholar of the San Francisco Regional Board discussed with District hydrologist John Clarke, water usage from the Anderson Reservoir.  According to a memorandum Scholar wrote regarding that call on October 26, 1961, Mr. Scholar noted that the District had no plans to monitor quality of Las Animas Creek, which flows through UTC property.

33.    In November 1961, Waste Discharge Requirements for the UTC Site were discussed and adopted at a meeting of the Pollution Control Board.  The District was mailed copies of the meeting agenda and tentative resolution on November 16, 1961.  On November 20, 1961, the District was sent the final discharge requirements.  The stated purpose of these discharge requirements was to "protect known present and probable future uses of the waters in Anderson Reservoir, as well as the underground waters of the area."  In 1963, 1964, 1969, 1972 and 1980, these revised waste discharge requirement were issued for the UTC Site. Records show the Water District received copies of all of the revised waste discharge requirements, except the 1964 revision.

### FINDINGS OF POLLUTION AT THE UTC SITE

34.    UTC began rocket fuel testing operations in approximately 1960.  These operations continued until approximately 2005.  Ammonium perchlorate was the primary

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

OLIN CORPORATION'S COUNTER-CLAIM

ingredient of rocket fuel used by UTC during this entire time. This perchlorate was deposited by UTC as waste to the ground in and around the UTC plant in the Las Animas Creek Watershed. District representatives have publicly estimated that UTC used 88 million pounds of ammonium perchlorate at the UTC Site. Administrative records state that UTC also burned 7 million pounds of perchlorate.

35.    In approximately 1980, the San Francisco Regional Board began to investigate the UTC Site for the presence of contaminants in groundwater. The San Francisco Regional Board took jurisdiction over this site and required UTC to investigate the sources of the identified contamination. These investigations and related proceedings continued for decades and continue to this day. The District was aware of these investigations and proceedings and informed of their existence and progress.

36.    In the course of these investigations of the UTC Site, UTC was required to drill hundreds of monitoring wells to both investigate and eventually remediate the groundwater at the UTC Site, as well as the surface water contamination of Las Animas Creek. On information and belief, the District was involved in permitting the wells installed at the UTC Site during these investigations.

37.    When pollution was initially discovered and investigated at the UTC Site, neither UTC nor the District investigated the possible migration of perchlorate from the UTC Site to the Anderson Reservoir. On information and belief, no investigation regarding perchlorate was conducted by UTC or others as part of the investigations at the UTC Site until approximately 1989, when soil samples were collected and analyzed for perchlorate. Perchlorate was detected in initial and subsequent soil samples at concentrations up to 6,200 mg/kg. The District was included on the distribution of the report containing these results of the perchlorate soil sampling concerning perchlorate on or about November 15, 1989. It does not appear that there was further investigation of these detections. Analysis of surface or groundwater samples for perchlorate was later conducted in approximately 1992. Perchlorate was then detected at elevated concentrations in initial and subsequent groundwater and surface water samples. Perchlorate samples from select locations

continued to be collected until 1995. Results of the perchlorate sampling in groundwater and surface water were published in 1996.

38.    In 1998 the San Francisco Regional Board issued Order No. 98-070, which specifically required UTC to investigate perchlorate at its facility. By this time, tens of thousands of gallons of groundwater had already been treated by UTC to remove volatile organic chemicals found in water at the UTC Site. However, this technology was ineffective in removing perchlorate from the contaminated water. For many years, until approximately the late 1980s, this perchlorate-laden "treated" water was disposed of in various ways, including direct discharge into tributaries of Anderson Reservoir, for dust control throughout the UTC Site and at offsite locations, and for fire control at offsite locations. The perchlorate investigation at the UTC Site begun in response to Order No. 98-070 soon demonstrated that large amounts of perchlorate waste had been deposited on or into soils, surface water, and groundwater at the UTC Site. High concentrations of perchlorate were found both in groundwater and in the Las Animas Creek, including at a sampling station approximately 200 feet upstream from Anderson Reservoir. Some of the highest concentrations of perchlorate known to have been recorded in the State of California were then found to exist near the UTC Site.

39.    Following this 1998 investigation, UTC began in approximately 2000 to attempt to control the perchlorate in the soil and water on the UTC Site and to take steps to directly address the migration of perchlorate-laden surface and groundwater into the Anderson Reservoir.

## THE DISTRICT'S RESPONSE TO INVESTIGATION OF PERCHLORATE AT THE UTC SITE

40.    The District knew of perchlorate usage at UTC since 1960, understood that perchlorate is highly soluble in water, understood surface and groundwater from the UTC Site drain into the Anderson Reservoir, and received analytical data pertaining to the presence of perchlorate in soil, groundwater, and surface water samples collected at the UTC Site from 1989 to 1995.

41.     On August 17, 1998 the District's staff geologist, Ms. Seena Hoose, wrote the San Francisco Regional Board on behalf of the District to comment on a proposed work plan at the UTC Site to investigate perchlorate migration from the UTC Site to water that would or could enter the Anderson Reservoir.

42.     In its August 17, 1998 letter to the San Francisco Regional Board (attached to this Counterclaim) the District stated:

> The District is extremely concerned about the continuous discharge of Perchlorate contaminated groundwater from the UTC Site into Anderson Reservoir. Anderson spillway is at 625-ft elevation, which is 500 feet from the UTC property boundary, as scaled from the UTC topographic map. … Thus, an immediate receptor of surface water discharges from UTC is Anderson Reservoir. Because Perchlorate does not volatilize, the concentration will not be diminished by downstream flow. Discharges of Perchlorate will reach the reservoir essentially undiminished by natural processes.

> For this reason, the Santa Clara Valley Water District (District) requests that the Regional Water Quality Control Board (RWQCB) require United Technologies to cease immediately from discharging Perchlorate into the creeks and as creek underflow going into Anderson Reservoir.

43.     In its August 17, 1998 letter, the District acknowledged that perchlorate was not subject to the initial risk assessments at the UTC Site. The District said, however, that perchlorate had been identified for study there since the early 1990s. The District's letter stated:

> Historic risk assessments at the site did not evaluate Perchlorate (pages 2-5 and 2-6), although CSD has been participating in a Perchlorate study group since 1993.

> The first analyses of creek water were taken in September of 1997 and were essentially ND. Subsequent samples collected in January, April and June of 1998 show concentrations as high as 7,000 ppb. More recent creek samples indicate even higher concentrations (19,000 ug/L in Mixer Creek). Why is it that UTC has been participating in a Perchlorate study group since 1993 and did not analyze the creek water or the contaminated groundwater earlier? The old analytical method would have identified anything over 100 ppb.

44.     The District also acknowledged that the earlier treatment and removal of volatile organic compounds from groundwater pollutants at UTC Site had further spread perchlorate to surface water destined for Anderson Creek. The District's August 1, 1998 letter

Morgan, Lewis &
Bockius LLP
Attorneys At Law
San Francisco

13

states:

> Releases of Perchlorate from groundwater discharges to surface
> water have apparently been happening for some time. The use of
> water from air strippers (cleaned up from VOCs) at several
> locations where Perchlorate had never been used (fig. 3-3) appear to
> have spread Perchlorate contamination to other parts of the site.

45.     The District's August 17, 1998 letter concludes that the perchlorate condition

at the UTC Site could have a "catastrophic" effect on the District's use of Anderson

Reservoir:

> This condition can affect the District's permit from the Department
> of Health Services office of Drinking Water to continue the use of
> Anderson Reservoir as a drinking water reservoir. Classification of
> this reservoir as an impaired water body will be catastrophic to
> district operations and our ability to supply safe drinking water to
> the people of Santa Clara County.

46.     Olin is informed and believes that the District began to test the Anderson

Reservoir water for perchlorate on or about 1997. After 1997, Olin is informed and believes

that the District's testing for perchlorate in the Anderson Reservoir has been generally

limited to collecting samples at three locations (north, middle, and south) from only the top

surface of the Reservoir. The northern end of Anderson Reservoir is closest to the UTC Site.

Olin is informed and on that basis believes that the District has not concentrated its testing in

this portion of the reservoir, has not conducted tests for perchlorate at different water depths,

including deep water testing, within the Reservoir.

47.     In a public meeting with the Regional Board in September 2006, the District

said that testing of the surface of the Anderson Reservoir has shown the presence of

perchlorate through the test results referred to as J-qualified findings. Previous public

disclosures by the District indicated only non-detection of perchlorate in Anderson Reservoir

samples.

48.     Olin is informed and believes that some time in the 1990s or earlier the

District dredged the sentiment at the bottom of the reservoir and removed it to an unknown

location. It is unknown whether any testing was ever done of this sediment by the District

for any purpose.  Olin is informed and believes that on that basis alleges that the District has not thereafter tested the sediment located in the Anderson Reservoir for perchlorate.

<b>INTRODUCTION OF PERCHLORATE INTO THE<br>LLAGAS SUB-BASIN BY DISTRICT FACILITIES</b>

49.    Olin is informed and believes and on that basis alleges that water containing perchlorate from UTC's operations and site entered the Anderson Reservoir in two principal ways.  First, the surface water from Las Animas Creek flowed over perchlorate-impacted soils and received perchlorate containing groundwater and other wastes and subsequently flowed into the Anderson Reservoir.  This occurred from 1960 at least up until the time UTC took action through remedial efforts directed toward perchlorate in the late 1990s or after 2000.  Second, perchlorate from several source areas reached groundwater beneath the UTC Site and migrated through shallow alluvium and/or the Santa Clara Formation and discharged into the Anderson Reservoir.

50.    Olin is informed and believes and on that basis alleges water containing perchlorate stored in the Anderson Reservoir was deposited in the Llagas Sub-basin through two mechanisms.  First, perchlorate containing water seeped out of the reservoir and into the groundwater of the Llagas Sub-basin.  Because the Anderson Reservoir was constructed with an earthen dam, leakage also likely occurred through and beneath the dam itself.

51.    Second, and most significantly, untreated water containing perchlorate was piped by the District directly from the Anderson Reservoir into District percolation ponds and facilities within the Llagas Sub-basin beginning in the early 1960s and continuing until at least 1987.  On information and belief, the amount of such water conveyed by the District through its Percolation Ponds and other facilities was over a billion gallons per year in most years.  All of the Percolation Ponds constructed by the District were designed to allow the water piped by the District from the Anderson Reservoir to rapidly seep into the Llagas Sub-basin unrestricted by the impermeable or semi-permeable clay or rock barriers which exist over other portions of the Sub-basin.  A significant portion of the Llagas Sub-basin even today contains water which has been imported by the District into the Llagas Sub-basin

MORGAN, LEWIS &<br>BOCKIUS LLP<br>ATTORNEYS AT LAW<br>SAN FRANCISCO

15

through its percolation pond facilities. Recent importation of water has likely spread the perchlorate and driven it deeper into the Basin.

52.     Underflow from the Anderson Reservoir dam migrates southward into the Llagas Sub-basin because ancient south-flowing streams emanated from the current dam site and their associated gravelly stream channels extend southward through the Sub-basin. The District's Percolation Ponds are located north of the Olin Facility. The District designed and constructed its Main Avenue percolation pond directly over those gravels. Because of this construction, perchlorate containing water injected by the District into these ponds was directed into the deepest portions of the Llagas Sub-basin.

53.     Olin's facilities are approximately three miles downstream, i.e., south, of the Anderson Reservoir. Because groundwater in Llagas Sub-basin flows to the south, it is likely that the presence of perchlorate upgradient, i.e., north of the Olin Facility is the result, in whole or in part, of perchlorate flowing southerly from the Anderson Reservoir or the District's holding pond facilities north of the Olin Facility.

54.     After the District became aware of the threat of migration of perchlorate and other waste into the Anderson Reservoir, the District did not test wells downgradient from the Anderson Reservoir or near the Percolation Ponds for the presence of perchlorate for many years. The District owns or operates at least one monitoring well (No. 09S03E15D005) located on Peet Road, immediately south of the Anderson Reservoir dam and approximately three miles north or upgradient of the Olin Facility. Sometime in 2003 or 2004, the District collected a sample from this well and observed perchlorate at 5.6 ppb. On information and belief, despite this and other findings the District did not and has not implemented a routine sampling plan for this or other wells under its control in the vicinity of District Facilities upgradient from the Olin Facility.

55.     There were and are multiple private well owners who use water from the Llagas Sub-basin located in this northerly section of the Llagas Sub-basin. In addition, the City of Morgan Hill has 15 municipal wells in this northerly area. The District is aware of the location of these wells. Olin is informed and believes the District has in recent years also

1   received analytical data voluntarily from many of these well owners in the area of the Llagas

2   Sub-basin near these facilities.  On information and belief, this data was known by the

3   District before Olin was ordered by the Regional Board to investigate the presence of

4   perchlorate north of the Olin Facility.

5          56.     The City of Morgan Hill pumps groundwater from the Llagas Sub-basin for

6   potable use.  Due to the proximity of several municipal wells to the Percolation Ponds, the

7   City also receives, indirectly, water imported to the Llagas Sub-basin by the District.  The

8   City of Morgan Hill, with knowledge and support of the District, has publicly claimed that

9   Olin was responsible for the presence of perchlorate in the northeast section of the Llagas

10   Sub-basin.  As a result of such claims, in part, the Regional Board ordered Olin to

11   investigate for sources of the perchlorate detected upgradient of the Olin Facility.  In the

12   course of this investigation Olin discovered that many of the private wells north of the Olin

13   Facility have had perchlorate findings in the two to four billion parts per billion range.

14   Many of these findings occur in the area near the Main Avenue Ponds, as well as near the

15   Anderson Reservoir dam itself.

16          57.     Olin for many years has requested from the City of Morgan Hill its historical

17   sampling data for wells north of the Olin facility.  The data was not provided to Olin, but it

18   was obtained by the Regional Board and made public in late 2006.  This data shows that all

19   of the wells operated by the City of Morgan Hill downgradient from either the Anderson

20   Reservoir dam or District Percolation Ponds and upgradient of the Olin Facility have had

21   perchlorate findings, including three wells located in the Coyote Sub-basin.  These findings

22   range from 2 to 5 parts per billion.

23          58.     Olin has obtained further testing results for perchlorate in private wells

24   located in the gravel channels south of the Anderson Reservoir in the Llagas Sub-basin.

25   These tests show that most wells located in gravel channels leading southward from the

26   Anderson Reservoir have perchlorate concentrations ranging between in 2 to 4 parts per

27   billion.

28

## FIRST CLAIM FOR RELIEF

### (Response Cost Recovery Under CERCLA Section 107(a), 42 U.S.C. Section 9607(a))

59.    Paragraphs 1-58 are incorporated herein by reference.

60.    Section 107(a) of CERCLA, 42 U.S.C. Section 9607(a), provides in pertinent part:

    (a)    Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section--

        (1)    the owner and operator of a vessel or a facility,

        (2)    any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,

        (3)    any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances,

                                * * * *

    … shall be liable for—

                                * * * *

        (4)

            (A)    all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan;

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

18

    (B)  any other necessary costs of response incurred by

any other person consistent with the national

contingency plan;

61. Olin is a "person" within the meaning of CERCLA Section 101(21), 42 U.S.C. Section 9601(21).

62. The Anderson Reservoir and the District's other Facilities described in this counterclaim are "facilities" within the meaning of CERCLA Section 101(9), 42 U.S.C. Section 9601(9).

63. Olin is informed and believes and thereon alleges that waste deposited, stored or transferred at District Facilities has caused a "release" and/or "releases" within the meaning of CERCLA Section 101(22), 42 U.S.C. Section 9601(22). The release or releases have consisted of "hazardous substances" within the meaning of CERCLA Section 101(14), 42 U.S.C. Section 9601(14), including, but not limited to perchlorate.

64. Olin is informed and believes and thereon alleges that the District owns and manages the District Facilities described in this Counterclaim, and  owned and operated the Facilities at the time of release of the above hazardous substances, and arranged for the storage or transfer of such hazardous substances at one or more of its Facilities.

65. As a result of the release of hazardous substances at the District's Facilities, Olin has incurred costs, including necessary costs, of response pursuant to CERCLA Section 107(a), 42 U.S.C. Section 9607(a). The costs have been consistent with the National Contingency Plan (NCP), 40 C.F.R. Part 300.

66. Olin is entitled under CERCLA Section 107(a), 42 U.S.C. Section 9607(a), to recover from the District the costs that Olin has incurred as a result of the release and threatened release of perchlorate or other waste at or through  District's Facilities, plus interest on such amounts.  Such costs include, but are not limited to, costs incurred by Olin in responding to and remediating soil, surface water and groundwater under Regional Board orders, all attorneys' fees and other necessary or reasonable costs incurred by Olin.

67. At or about the time of filing this Complaint, Olin provided a copy of this

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Complaint to the Attorney General of the United States and the Administrator of the United States Environmental Protection Agency pursuant to CERCLA Section 113(1), 42 U.S.C. Section 9613(1).

## SECOND CLAIM FOR RELIEF

### (Equitable Contribution and Recovery Under CERCLA Section 113(f))

68.    Paragraphs 1-67 are incorporated herein by reference.

69.    The District has filed an action against Olin under CERCLA Section 107. CERCLA Section 113(f) provides that if District is entitled to any recovery from Olin under CERCLA Section 107 as alleged in its complaint, which Olin denies, Olin is entitled to equitable contribution from the District under CERCLA Section 113(f), including subsection 113(f)(1).

70.    Olin has paid and continues to pay more than its equitable share in order to address, respond, investigate, remediate and otherwise address the findings or presence of perchlorate in the Llagas Sub-basin.  The District has contributed to such findings and presence of perchlorate as alleged above.  Olin is entitled under CERCLA Section 113(f) to the entire equitable share of the District's contribution to the finding or presence of perchlorate in the Llagas Sub-basin.

## THIRD CLAIM FOR RELIEF

### Declaratory Relief Under CERCLA Section 113(g)(2), 42 U.S.C. Section 9613(g)(2))

71.    Paragraphs 1-70 are incorporated herein by reference.

72.    CERCLA Section 113(g)(2), 42 U.S.C. Section 9613(g)(2), provides in pertinent part:

> In any action described in this subsection the court shall enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages.

73.    Olin is entitled to a declaratory judgment pursuant to CERCLA Section 113(g)(2), 42 U.S.C. Section 9613(g)(2), binding as to any subsequent action or actions.  Such

1    judgment shall declare that the District is liable to Olin for any costs, damages and liability that

2    Olin may incur as a result of the release or threatened release of perchlorate or other waste

3    emanating from District Facilities.

4                                    **FOURTH CLAIM FOR RELIEF**

5                                       **(Claim for Indemnity Under**
      **Cal. Health and Safety Code Sections 25300-25395.45, 25363(e)**
6                    **The Hazardous Substances Account Act - "HSAA")**
                     **Paragraphs 1-73 are incorporated herein by reference.**
7
8            74.    California Health and Safety Code Section 25363(e) provides in pertinent

9    part:

10           Any person who has incurred removal or remedial action costs in
             accordance with this chapter or the federal act [CERCLA] may seek
11           contribution or indemnity from any person who is liable pursuant to
             this chapter … In resolving claims for contribution or indemnity,
12           the court may allocate costs among liable parties using those
             equitable factors which are appropriate.

13           75.    Olin is a person as defined by the Hazardous Substances Account Act,

14   including Section 25319.  Olin is informed and believes and thereon alleges that the District

15   has released or may continue to release "hazardous substances" within the meaning of this

16   statute at and in the vicinity of District Facilities, including, but not limited to, perchlorate.

17           76.    Olin has incurred removal and remedial action costs in response to the

18   District's current or past release of such substances at its Facilities within the meaning of

19   Section 25363(e) of the California Health and Safety Code, including costs for response,

20   removal or remedial actions incurred in complying with orders of the Regional Board.

21           77.    Olin is informed and believes and thereon alleges that the District is a

22   responsible and liable party for the release of such substances at the District Facilities within

23   the meaning of Sections 25323.5 and 25363(e) of the California Health and Safety Code.

24   Olin is entitled to indemnity under Section 25363(e) of the California Health and Safety

25   Code from the District with respect to all present and future costs of response, removal and

26   remedial action incurred by Olin, plus interest.

27           78.    At or about the time of filing this Complaint, Olin provided written notice to

28   the Director of the California Department of Toxic Substances Control pursuant to Section

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

21

25363(e) of the California Health and Safety Code.

## FOURTH CLAIM FOR RELIEF

### (Negligence)

79.     Paragraphs 1-78 are incorporated herein by reference.

80.     The District owed and owes a duty of care to prevent, control and monitor perchlorate and other wastes in and from the District Facilities.

81.     By the District's failure to exercise due care the District's Facilities or actions have likely introduced water containing waste, including perchlorate into the Llagas Sub-basin, or exacerbated the presence of such perchlorate in that basin.  The District has failed to use due care to adequately test, monitor or inspect District Facilities to detect or measure the presence of perchlorate.  The District has further failed to exercise due care to adequately test, monitor or inspect the groundwater in the Llagas Sub-basin downgradient or near its Facilities for the presence of perchlorate.  The District has failed to exercise due care through its statements or through its support of statements of others regarding the presence of perchlorate in the Llagas Sub-basin.

82.     As a direct and proximate result of these acts and omissions of the District, Olin has been damaged and harmed as claimed herein.  The District's acts and omissions, as claimed above, have caused and will continue to cause Olin to investigate, respond, remediate and otherwise address the presence of perchlorate in the Llagas Sub-basin.  As a result of these acts and omissions, Olin has also been required to defend itself in legal proceedings brought by third parties and has investigated, responded to, and addressed perchlorate findings for which the District is responsible.

## FIFTH CLAIM FOR RELIEF

### (Declaratory Relief Under 28 U.S.C. Sections 2201 and 2202)

83.     Paragraphs 1-82 are incorporated herein by reference.

84.     28 U.S.C. Section 220l provides:

> In a case of actual controversy within its jurisdiction … any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

22

seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

85.    An actual controversy exists regarding the District's liability to Olin for costs that Olin has incurred and may in the future incur as a result of releases of perchlorate or other waste caused or contributed to by District Facilities or actions.

86.    A declaratory judgment is necessary for Olin to establish its rights against the District with respect to such costs.

87.    With respect to costs, including costs of response, removal, remedial action, and abatement, incurred by Olin as a result of the releases at and emanating from District Facilities, the facts giving rise to the controversies for which Olin seeks declaratory relief have already occurred, and the incurrence by Olin of future costs is neither unlikely, remote, nor speculative.

88.    28 U.S.C. Section 2202 provides:

Further necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment.

89.    Olin requests that this Court, after entering the declaratory judgment prayed for herein, retain jurisdiction over this action to grant Olin such further relief against the District as is necessary and proper to effectuate the Court's declaration.

## SIXTH CLAIM FOR RELIEF

### (Declaratory Relief Under California Law)

90.    Paragraphs 1-89 are incorporated herein by reference.

91.    A dispute has arisen and an actual controversy exists between Olin and the District because, among other things, Olin contends that the District is obligated to indemnify Olin and reimburse Olin for all response and remedial costs as set forth herein, including but not limited to environmental investigation and remediation costs that have been and will be incurred by Olin to respond to the releases caused by the District.  Olin is informed and believes, and on that basis alleges, that the District denies all such obligations.

92.      Olin requests a judicial determination pursuant to California Code of Civil Procedure § 1060 of Olin's right to total or partial reimbursement and indemnification from the District for all costs incurred by Olin as a result of releases of the substances as alleged herein.

**WHEREFORE**, Olin prays for judgment against the District as follows:

1.      For reimbursement and indemnification with respect to all costs of response, investigation, removal, remedial action and abatement incurred by Olin as a result of the releases of perchlorate or other wastes at and emanating from the District's Facilities;

2.      For damages resulting from the District's acts of omission or lack of due care;

3.      For Olin's costs incurred in this action;

4.      For declaratory judgment that the District is liable to Olin for all future costs and damages, including costs of response, removal, remedial action, and investigation incurred by Olin as a result of the releases of perchlorate or other wastes at and emanating from District Facilities;

5.      For such other and further relief as the Court may deem appropriate; and

6.      Counter-Claimant Olin requests a jury trial on its fourth claim for relief as well as all claims so triable in the event Counter-Defendant is allowed a jury trial on the claims asserted in its Complaint.

Dated: November 1, 2007                  MORGAN, LEWIS & BOCKIUS LLP

By       /s/ Michael E. Molland
         MICHAEL E. MOLLAND
         Attorneys for Counter-Claimant
         OLIN CORPORATION