*Sent by e-mail*

TO: Cecil Felix, RWQCB #2
FROM: Seena Hoose, SCVWD
DATE: August 17, 1998

SUBJECT: Workplan to Investigate Perchlorate Migration Control to Surface Waters for United Technologies Corp., by ICF Kaiser Engineers

Anderson Reservoir and the Anderson/Coyote watershed provide 50,000 acre-feet per year, about 1/6 of the water supply for Santa Clara County, approximately 1.7 million people. The Reservoir has a capacity of 89,000 acre-feet and is also used as a resting-place for imported water from the San Felipe Project. Water from Anderson Reservoir is taken by pipeline directly to two District water treatment plants, Rinconada and Santa Teresa. At the water treatment plants it is disinfected, filtered, blended, and then delivered directly to customers. Roughly 283,000 people drink water from Anderson Reservoir annually, not counting the water recharged to groundwater supply along Coyote Creek.

The District is extremely concerned about the continuous discharge of Perchlorate contaminated groundwater from the UTC site into Anderson Reservoir. Anderson spillway is at 625-ft elevation, which is 500 feet from the UTC property boundary, as scaled from the UTC topographic map. The sampling point C-29 is about 450 feet upstream from the Anderson high water elevation. Thus, an immediate receptor of surface water discharges from UTC is Anderson Reservoir. Because Perchlorate does not volatilize, the concentration will not be diminished by downstream flow. Discharges of Perchlorate will reach the reservoir essentially undiminished by natural processes.

For this reason, the Santa Clara Valley Water District (District) requests that the Regional Water Quality Control Board (RWQCB) require United Technologies to cease immediately from discharging Perchlorate into the creeks and as creek underflow going into Anderson Reservoir. This requirement would be in accordance with past Waste Discharge Requirements, with Porter Cologne Water Quality Control Act, with the County use permit for UTC, and with Federal law.

Detailed comments on the subject workplan follow.

Executive Summary, 3rd paragraph. It is not necessary to have a series of investigations to determine where Perchlorate is entering the creeks. Extensive studies have already been performed for Shingle Creek and elsewhere to determine the location of VOC contamination discharging to the creeks. The Source Identification reports done in 1990 and 1991a (as well as other reports listed on pages 2-4 and 2-5) should include Perchlorate source areas. It is most appropriate for UTC to compile all existing information on known discharges to creeks and known Perchlorate use and disposal areas, along with known plume configurations. Evaluation of this information and its use as a basis for prompt interim remedial action is reasonable. Additional detailed studies

1

can be performed concurrently with the interim remedial actions to define the differences between Perchlorate plumes and VOC plumes.

Executive Summary 4th paragraph, page ES-1. It is unnecessary to wait until low concentration treatment technologies are available to begin bench testing and treatment system design. The treatment system at Aerojet (Sacramento) is essentially complete and will be in operation within a very few months. Although the treatment technologies available may not meet the current action level, they can greatly reduce the mass of Perchlorate at the site. The treated water can be re-used to enhance the cleanup in areas already known to contain Perchlorate contamination. Perchlorate treatment technology can be upgraded as new technology is being developed by Department of Defense contractors.

Executive Summary 5th paragraph, page ES-1. UTC-CSD should not delay migration control activities to eliminate Perchlorate impacts to the creeks until after additional treatment technologies are available. It is not necessary to wait until all Perchlorate migration pathways are identified to begin migration control. Migration control can begin with the already known locations where contaminants reach the creeks and while those are being mitigated, if contamination is still reaching the creeks, additional investigation can be conducted concurrently with the interim remediation and migration control.

Proposed Future Tasks and Schedule, page ES-2. This schedule is totally unacceptable to the District. Based on the extensive knowledge of the site already developed, it appears appropriate to have an interim migration control plan submitted in September or October of 1998 and implemented during December of 1998. It is in no way acceptable to delay 1 ½ years before initiating migration control activities.

Historic risk assessments at the site did not evaluate Perchlorate (pages 2-5 and 2-6), although CSD has been participating in a Perchlorate study group since 1993. The California Department of Health Services has adopted 18 ppb as its provisional action level for Perchlorate. The external review for US EPA did not find that the thyroid follicular cell tumors were the worst result of exposure to Perchlorate or that other organs were not affected by Perchlorate (page 2-11). Thus, a lower level may be determined but, unless other information is found, it appears unlikely that a higher action level will be determined for Perchlorate. It therefore seems prudent that UTC should begin work with a target concentration of Perchlorate as close to 18 ppb as is technically practical, and adjust the level as technology improves and a MCL is promulgated.

The first analyses of creek water were taken in September of 1997 and were essentially ND. Subsequent samples collected in January, April and June of 1998 show concentrations as high as 7,000 ppb. More recent creek samples indicate even higher concentrations (19,000 ug/L in Mixer Creek). Why is it that UTC has been participating in a Perchlorate study group since 1993 and did not analyze the creek water or the contaminated groundwater earlier? The old analytical method would have identified anything over 100 ppb.

Releases of Perchlorate from groundwater discharges to surface water have apparently been happening for some time. The use of water from the air strippers (cleaned up from VOCs) at several locations where Perchlorate had never been used (fig. 3-3) appear to have spread Perchlorate contamination to other parts of the site. This activity should not be continued unless extraction systems are installed which will prevent groundwater discharge to the creeks or unless detailed studies show that the use of Perchlorate contaminated water for irrigation has not affected soil or groundwater. In any case the high Perchlorate concentrations should be reduced before re-use of the treated water.

Monitoring wells OS-1 and OS-2 were installed as guard wells to verify that the pump and treat system in lower shingle valley was successfully preventing off site migration of the VOC plume. Based on the results in this report – the Perchlorate groundwater plume has migrated off site. This indicates that the containment of the VOC plume by pump and treat is not as effective for Perchlorate. The Perchlorate plumes have migrated beyond the influence of the VOC cleanup measures.

Based on this information the District encourages the RWQCB to re-examine the Order for Operating Unit 1 and amend or substantially revise the Order to address the Perchlorate problem.

Treated Groundwater (3.3). UTC indicates (page 3-7) that a significant proportion of the groundwater extraction system has been shut down because of high Perchlorate concentrations. This underscores the urgency of developing a treatment system that will remove the major mass of Perchlorate from the groundwater. Groundwater concentrations are reported as high as 111,000 ug/L. When these groundwater extraction systems are left off ALL contaminants at the site continue to migrate toward Anderson Reservoir. This entire groundwater system discharges to these creeks. During winter rainfall events the soil quickly absorbs rainfall and discharges from groundwater to the creeks increase dramatically. It is critical that the pump and treat remediation systems be turned back on. Later is not OK.

Because we have no measurements of the volume of water moving through the drainage system (creeks) it is impossible to evaluate the contaminant loading going to Anderson. It would be appreciated if UTC would re-establish regular stream gauging stations on Shingle, Mixer, Animas, and San Felipe Creeks and measure them at high flows, and at regular intervals during periods of low flows. Dry periods should also be identified. The underflow barrier placed in Shingle Creek last summer should also be evaluated for its effectiveness.

Soil Contamination (3.4). Perchlorate contaminated soil was identified during investigations from 1989 through 1992. Some of the most significant soil contamination is listed in Table 3-3, the highest concentration being 6,200 mg/kg. Additional soil sampling was performed in March of this year, mostly at the open burn pits. In recognition that Perchlorate is highly soluble and that other chemicals are leached from soil into groundwater at the UTC site, why is it that groundwater analyses for perchlorate

were not a standard analysis until just recently? I seem to recall Beth Levine asking for perchlorate analyses in groundwater sometime around 1987 (possibly in the first UTC WDR).

Section 4 discusses additional sampling to determine sources and pathways for Perchlorate migration to surface waters.

Creek sampling locations proposed are fine (fig. 4-1). However, UTC probably should return to the creek sampling points in the WDR prior to the current Operating Unit 1 SCR. This would allow a comparison between known locations of VOC discharges to Shingle Creek and Perchlorate discharges to Shingle Creek. The same is true for Mixer Creek, where locations with consistently high VOC or PCB contamination are not included in the proposed locations on Fig. 4-1. The known seep locations in Shingle Creek and Mixer Creek should be sampled for Perchlorate immediately.

A subset of duplicate samples should be sent to a second laboratory as I am presuming that the California DHS-approved laboratory will be the UTC laboratory.

Section 5 Evaluation of Technologies for controlling perchlorate contamination to surface waters.

As stated above, many of the source areas are already known, as are the points of discharge to the creeks. This is less true for the Panhandle/Burn Pit contamination than for the contamination in Mixer and Shingle Valleys. It is not necessary to know all the potential points of discharge to the creeks before beginning to control the areas UTC already knows are discharging to the creeks. The District strongly supports the use of interim remedial measures for Perchlorate discharges at this site.

Table 5-1. In order to identify non-CSD sources of Perchlorate, UTC should sample the creeks upstream of the site or at the boundary of their property in the Old C-3 location and along San Felipe Creek upstream of the eastern side of the Burn Pit area. This question can be resolved at the first round of creek sampling.

Control measures which have repeatedly been recommended to UTC are not included in the measures evaluated. The previous suggestion was to install slurry walls across lower Shingle Valley and lower Mixer Valley as a fixed barrier to further migration of the plumes. The slurry walls would need to cut off all the alluvium down to the Santa Clara Formation, 25 to 45 ft beneath ground surface. These would be relatively small slurry walls compared to those installed at other Santa Clara Valley cases.

When combined with pump and treat in areas where groundwater discharges to the creeks, this approach should be very effective at controlling Perchlorate migration off site. Controlling Perchlorate from the Open Burn Pits may be more difficult because the migration pathways to the creek are not as well known at this time. There is no reason to delay migration and discharge control activities.

Section 5.1.2. The shut down of high Perchlorate concentration pumping wells is a serious problem. This reduction in pumping allows continued migration of the VOCs as well as Perchlorate. During the period before a perchlorate treatment system is on-line, UTC could spray VOC cleaned water upgradient of effective pumping wells and move the other contaminants toward the extraction wells while temporarily delaying the need to discharge water with Perchlorate concentrations. This could represent a sort of dynamic temporary storage system. The District agrees with the Regional Board that this is a viable approach to keeping the pump and treat system operating to protect against surface water discharges.

Section 5.1.3. Several treatment technologies are currently under development. Aerojet, Sacramento will have a large volume treatment system on line in September 1998. UTC can purchase a license to use the Aerojet technology and build a treatment system now or they can begin bench testing other approaches right away and begin construction early next year. As a participant in the Air Force led Interagency Perchlorate Steering Committee, UTC has ready access to all developing treatment technology information. They can begin by reducing the concentration of Perchlorate and continuing to spray upgradient of extraction systems until such time as appropriate technological solutions can be added to the treatment train to reduce the concentrations to whatever is determined to be the appropriate regulatory concentration at that time.

Section 5.2. The actions proposed to reduce potential Perchlorate contamination entering the creeks due to sediment in surface runoff and remediation of contaminated soil appear appropriate and adequate.

Section 6.0  As an initial response to the recognition of the Perchlorate problem in groundwater at the site, turning off the extraction wells made sense. However, turning off all the extraction wells in the open Burn Pit area and most of the wells in Mixer Valley is not an acceptable solution from the District's point of view, because it allows the continued migration of both Perchlorate and VOCs as indicated earlier.

The proposed schedule in Table 6-1 is not appropriate. The first three phases of investigation can be accomplished virtually simultaneously based on information UTC already has and could be submitted in the early fall. Bench testing or treatment system design can begin now and proceed simultaneously with the evaluation of conditions. Construction of a treatment system should begin early next year. The interim migration control system proposal and design can be developed concurrently with writing the report for Phases 1-3. The plan could be submitted in the late fall or early winter, approved and construction begin in the spring or early summer of 1999. This would allow for an effectiveness evaluation report on the interim migration control and the treatment system operation by December of 1999.

The District sincerely appreciates the efforts of the Regional Board in regulating this complex and challenging contaminated site. I am available to meet with you and/or the discharger at any time. Thank you for your consideration of the District's concerns.

GARY FAHLER – ELEVATION OF SPILLWAY AT ANDERSON  625 ft.

This condition can affect the District's permit from the Department of Health Services office of Drinking Water to continue the use of Anderson Reservoir as a drinking water reservoir. Classification of this reservoir as an impaired water body will be catastrophic to district operations and our ability to supply safe drinking water to the people of Santa Clara County.

Disk:  UTC disk 1
Filename: a:\perchlorate\ltr-wkpln.msw
Origin:  August 17, 1998