**E-FILED on** _8/19/09_

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

SANTA CLARA VALLEY WATER
DISTRICT,

        Plaintiff,

    v.

OLIN CORPORATION; and DOES 1-10,
inclusive,

        Defendants.

No. C-07-03756 RMW

ORDER GRANTING DEFENDANT'S
MOTION FOR PARTIAL SUMMARY
JUDGMENT ON PLAINTIFF'S COST
RECOVERY CLAIM AND CERTAIN
DAMAGES SOUGHT ON ITS
NEGLIGENCE CAUSE OF ACTION

**[Re Docket No. 90]**

    Defendant's Motion for Partial Summary Judgment on Plaintiff's Cost Recovery Claim and

Negligence Cause of Action came on for hearing before the court on May 22, 2009.[1]  In this motion,

defendant seeks: (1) summary adjudication that plaintiff's "recharge costs" are not recoverable under

CERCLA or any other asserted cause of action; and (2) summary judgment on plaintiff's negligence

---

[1]  Defendant's motion to strike plaintiff's jury demand also came on for hearing on May 22, 2009 and
was submitted for decision.  Defendant's Motion for Summary Judgment, or Alternatively for Partial
Summary Judgment, on Plaintiff's Remaining Cost Recovery Claims is also under submission.  The
court will issue separate written orders on these motions.

United States District Court
For the Northern District of California

1  cause of action including a determination that plaintiff cannot recover its attorney's fees and

2  litigation expenses incurred in defending against third party actions.

3       Having considered the papers submitted by the parties and the arguments of counsel at oral

4  argument, and for good cause appearing for the reasons set forth below, summary judgment is

5  granted in favor of defendant on plaintiff's claim for recharge costs on all causes of action and for

6  attorney's fees and costs on plaintiff's tort of another theory on its negligence claim.  The motion is

7  otherwise denied without prejudice on plaintiff's negligence claim.

8                                  **I. BACKGROUND**

9       Olin Corporation is the owner of real property in Morgan Hill, which is the source of

10 perchlorate contamination in the Llagas Subbasin groundwater.  Santa Clara Valley Water District

11 ("SCVWD" or "District") filed suit against Olin in 2007 seeking to recover costs it incurred in

12 response to the contamination, including costs of providing bottled water to customers, providing

13 technical advice to affected cities, and other items.  The total amount of claimed damages was in the

14 range of $4 million.  Smith Decl. Ex 2.  More recently, the District disclosed that it is seeking to

15 recover the full cost of the District's "recharge" operations incurred since 2003.  The total "recharge

16 costs" exceed $29 million.  *Id.*

17      Although it is not clearly described in the parties' briefs, recharging the Llagas subbasin

18 appears to involve importing water from the Central Valley Project through the District's percolation

19 ponds to replenish the groundwater removed by consumers from water wells, to the extent that

20 natural recharge (through rainfall) is not sufficient to replenish the water basin.  The primary

21 purpose behind recharging the subbasin has been to provide a water supply in the basin. (Smith

22 Decl. Ex. 8, Wadlow Depo. at 97:12-20).  The District has been recharging the Llagas Subbasin for

23 decades as an ordinary part of its practice in order to maintain the water supply.  The recharge

24 activities have not been undertaken for the purpose of cleaning up the perchlorate, nor have they

25 been undertaken in reaction to, or as a response to, the perchlorate contamination in the subbasin.

26 The District expressly acknowledged at the hearing on the current motions that it is "not basing its

27 claim for recharge on a contention that there were any greater costs to the recharge program as a

28 result of the presence of perchlorate."  Berka Argument 5/22/09.

ORDER GRANTING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFF'S COST RECOVERY
CLAIM AND CERTAIN DAMAGES SOUGHT ON ITS NEGLIGENCE CAUSE OF ACTION—No. C-07-03756 RMW
TER                                                                      2

The District contends nevertheless that it should be able to recover these recharge costs from Olin because Olin and the Regional Water Quality Control Board are relying upon the District's recharge activities as an "essential component" of the efforts to remediate the perchlorate contamination.  Opposition at 5, Berka Decl. Ex. M at 3-15 (Revised Llagas Subbasin Cleanup Feasibility Study).  The District argues that its recharging of the basin has the effect of diluting the perchlorate in the groundwater and that if Olin were required to "pump and treat" instead of "monitor and attenuate," it would cost Olin more than $295 million.  Opp. at 4, citing Berka Decl. Ex. M at 4-8.  The District relies heavily on Olin's Revised Llagas Subbasin Cleanup Feasibility Study ("the Study"), and the Water Board's subsequent Cleanup Abatement Order, as the underlying justification for why the costs of its recharge activities should be recoverable under CERCLA.

Olin submitted the Study to the Regional Water Quality Control Board in 2006.  Berka Decl. Ex. M.  The Study divided the proposed remediation approaches according to Priority Zones, depending on the concentration of perchlorate in the zone.  Priority Zone A, also referred to as the "plume core," corresponds to the areas with the highest concentration of perchlorate, above 24.5 micrograms per liter ($\mu g/L$).  Priority Zone B is defined as the area where the groundwater contains perchlorate at concentrations between 24.5 $\mu g/L$ and greater than 11.0 $\mu g/L$.  Priority Zone C is defined as the area where groundwater contains perchlorate at concentrations of between 11.0 and 6.0 $\mu g/L$.  (Study at xiii-xiv, and 6-2).  The Study considered four remedial alternatives for each Priority Zone: 1) no further action; 2) monitored attenuation; 3) groundwater extraction and ex-situ treatment; and 4) in-situ groundwater treatment.  *Id.* at xiv.

First, the "No Further Action" (also referred to as "NFA") option "involves taking no active remedial action to remedy the current or future concentrations of perchlorate in groundwater within the Llagas Subbasin; monitoring of natural attenuation processes already occurring does not occur with this option.  Should no further action be a recommended action, then site closure may be deemed appropriate."  *Id.* at 6-5.

Second,

Monitored Attenuation (MA) is the process where contaminant concentrations decline by natural and engineered processes, such as biological processes, dilution and dispersion processes, chemical transformation processes, or physical

United States District Court
For the Northern District of California

1  transformation processes.  It may be differentiated from the NFA approach in that
2  natural attenuation processes are actually monitored with MA and is also typically
   selected with active remediation (e.g., groundwater extraction/injection) and is
3  limited to areas with low concentrations, typically at sites where there are no current
   receptors.

4  *Id.* at 6-6.[2]

5  Third, groundwater extraction and ex-situ treatment

6  involves the pumping of groundwater from strategically located wells to a treatment
   system and then discharging the treated groundwater to an approved receptor.... Due
7  to perchlorate's high solubility and minimal sorption during groundwater flow,
   groundwater extraction is a viable means to capture large volumes of perchlorate
8  impacted groundwater within limited areas, and as such, groundwater extraction is an
   appropriate and effective remedial technology for the Llagas Subbasin, particularly
9  within the plume core.

10  *Id.* at 6-7.

11  Olin proposed to use hydraulic containment and treatment for Priority Zone A, the area

12  corresponding to the plume core, and monitored attenuation for the areas outside the plume core

13  where perchlorate concentrations were lower.  *Id.* 7-20 to 7-21.  The Study describes the proposed

14  monitored attenuation as follows:

15  This alternative consists of routine groundwater monitoring activities to establish
    and confirm trends in declining perchlorate concentrations over time due to
16  attenuation processes.  The main monitored attenuation processes at Priority Zone B
    would consist of:

17
18  1.  Reduction in mass in the source area due to ongoing remedial actions
        onsite and throughout the Subbasin, as well as proposed remedial actions
        in Priority Zone A.
19
20  2.  Dilution and infiltration to the shallow aquifer due to percolation of
        precipitation.

21  3.  Dilution/mixing due to imported water from the SCVWD's recharge
22      ponds.

23  4.  Continued irrigation with water from intermediate aquifer, coupled with
        reduction of perchlorate in intermediate aquifer (due to the reduced flux
        noted above) will result in a reduction of shallow aquifer concentrations.
24
25  5.  Reduction in mass due to continued extraction from existing municipal
        and private supply wells.

26

27  [2]  The only significant difference between Monitored Attenuation and No Further Action is that the
     former requires ongoing monitoring.  The approved response action is thus monitoring the
28  perchlorate concentrations to determine whether they continue to decrease.

1  Revised Feasiblity Study, pp. 7-6 to 7-7, Berka Dec. Ex. M.

2      The Regional Water Quality Control Board approved the proposal.  The 2007 Cleanup

3  Abatement Order the Water Board provides that

> The approved offsite cleanup strategy consists of a phased cleanup approach for
> perchlorate-impacted groundwater within the Llagas Subbasin.  Implementation
> of the phased approach includes hydraulic containment and treatment of
> groundwater (i.e., pump and treat) in the area of highest concentrations (plume
> core) in combination with monitored attenuation for those areas with lower
> perchlorate concentrations.

Ex. I at 11 ¶26.  The Cleanup Abatement Order directed Olin to "proceed with immediate

implementation of a phased groundwater cleanup approach within the Llagas Subbasin" for those

portions of the subbasin "that have been impacted by perchlorate discharges from the Olin Facility."

Ex. I at 20, ¶D.  Specifically,

> [t]he approved cleanup strategy includes the following components:
>
> •   **Extraction Wells**: Installation of a sufficient number of dedicated
>     groundwater extraction wells at appropriate locations with in Priority Zone
>     A ... to achieve effective hydraulic control and treatment of perchlorate-
>     impacted groundwater to downgradient areas, and to achieve compliance
>     with groundwater cleanup requirements.
>
> •   **Monitored Attenuation:** Monitored attenuation is conditionally approved
>     as a remedy component of the approved groundwater cleanup strategy and
>     shall be implemented throughout the areas of the Llagas Subbasin with
>     lower concentrations of perchlorate.  Monitored attenuation shall apply to
>     all portions of the Llagas Subbasin outside of the plume core....

*Id.* at 20-21.

As noted above, the District relies heavily on the Revised Feasibility Study and

subsequent Cleanup Abatement Order as the basis for its contention that its recharge costs

are recoverable under CERCLA.  In pointing to the Study, however, the District overlooks

the fact that it has historically engaged in recharging operations to provide an adequate

supply of water for its customers and that there is no evidence that it has engaged in recharge

operations as a response to or as a necessary consequence of the perchlorate contamination.[3]

---

[3]     The District also takes snippets of the Study out of context to create a misleading implication
that the Study is evidence that District's recharge activities are an essential component in the cleanup
of the perchlorate in the subbasin.  *See* discussion *infra* at 15 et seq.

1       The District also takes an expansive view of what recharge costs include.  Under the

2   rubric of seeking to recovery its "recharge costs," the District seeks to recover all of the

3   money it spent on its water utility program that it had allocated to the Llagas subbasin from

4   2003 through 2008.  (Smith Decl. Ex. 4, Taylor Depo. at 1324:14-19).  The claim is not

5   limited to costs that were incurred in conducting recharge activities, however, and the

6   claimed "recharge costs" include costs with no factual connection to Olin or to remediating

7   perchlorate in the subbasin.  Among other things, under the "recharge cost" umbrella, the

8   District seeks to recover the costs associated with the impacts of underground storage tanks

9   and cleanup from gas stations, costs incurred to insure "dam safety," costs for research

10  related to the release of dry-cleaning solvents, and the District's compliance with

11  environmental regulations.  Motion at 5; Smith Decl. Exh. 3.  The District also seeks to

12  recover as recharge costs:

13      •       the salary of every District employee who had anything to do with the Llagas

14              subbasin's water utility function.  (Smith Decl. Ex. 4, Taylor Depo at 1342:4-

15              10);

16      •       the cost of the District's programs addressing contamination in the groundwater

17              in the Llagas subbasin besides perchlorate, such as nitrate contamination and

18              solvent contamination.  (Smith Del. Ex. 4, Taylor Depo at 1396:14-1397:13

19              (nitrate), 1406:23-1407:6 (solvent contamination));

20      •       the cost of work undertaken by the District to understand and document the

21              District's water rights versus the water rights of other persons, agencies or

22              entities in the county.  (Smith Decl. Ex. 4, Taylor Depo at 1398:18-1399:2);

23              and,

24      •       the costs for "water quality outreach," which are comprised of the District's

25              marketing efforts to reach out to the public for conservation campaigns and the

26              like.  (Smith Decl. Ex. 3, Taylor Depo at 317:24-318:12).

27  The District appears to concede that these claimed costs have no apparent connection to perchlorate

28  remediation or to Olin and does not deny that they are not recoverable from Olin.  Instead, the District

ORDER GRANTING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFF'S COST RECOVERY
CLAIM AND CERTAIN DAMAGES SOUGHT ON ITS NEGLIGENCE CAUSE OF ACTION—No. C-07-03756 RMW
TER

United States District Court
For the Northern District of California

1   asserts that these cost items "are only a small percentage of the overall claim the District is making to

2   recover the costs of operating the recharge program" and that a dispute over particular cost items

3   would not warrant a grant of summary judgment on the entire cost claim.  Opp. at 7-8.

## II.  ANALYSIS

### A.      General Standards on Summary Judgment

6         Summary judgment is proper where the pleadings, discovery, and affidavits show that there is

7   no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.

8   Fed. R. Civ. P. 56(c).  Material facts are those which may affect the outcome of the case and a dispute

9   as to a material fact is "genuine" only if there is sufficient evidence for a reasonable trier of fact to

10  decide in favor of the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

11  The moving party has the burden to demonstrate that no genuine issue of material fact exists and that

12  it is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 321 (1986).

13  Where a defendant moves for summary judgment on an issue upon which the plaintiff bears the

14  burden of proof at trial, the moving defendant may meet its burden by showing that there is an absence

15  of evidence to support the non-moving party's case, *Celotex*, 477 U.S. at 325, or by submitting

16  affirmative evidence that disproves an essential element of the plaintiff's claim.  *Adickes v. S.H. Kress*

17  *& Co.*, 398 U.S. 144, 158-160 (1970).

18        After the moving party has met its burden under Rule 56(c), then the non-moving party has the

19  burden of coming forward with admissible evidence to show that a genuine issue of material fact

20  exists.   Fed. R. Civ. P. 56(e)(2).  If the non-moving party does not do so, then summary judgment is

21  appropriate.  *Id.*; *Celotex*, 477 U.S. at 322.   If the evidence is not sufficient for a reasonable jury to

22  find in plaintiff's favor, summary judgment is appropriate.  *Anderson*, 477 U.S. at 249; *Matsushita*

23  *Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 585-89.

### B.      Motion for Partial Summary Judgment on Recharge Cost Claim

####     1.      Standing

26        Olin first contends that the District does not have standing to assert a claim to recover its

27  recharge costs because the District has already passed those costs on to its customers.  Thus, argues

28

1  Olin, the District has not suffered any injury-in-fact sufficient to confer standing to assert the cost

2  recovery claim.

3      Olin's argument is not persuasive. The District is the party who incurred the recharge costs and

4  it defies common sense to assert that it has no standing to seek their recovery. *See Central Arizona*

5  *Water Conservation District v. United States Environmental Protection Agency*, 990 F.2d 1531, 1537-

6  38 (9th Cir. 1993) (finding that water district had standing to assert claims, even if it intended to pass

7  on to its customers the increased costs). There may well be other reasons why the District cannot

8  recover the claimed recharge costs, such as the prohibition on double recovery, but lack of standing is

9  not one of them.

10              **2.      Prohibition on Double-Recovery**

11      The parties' briefs touch on, but do not significantly discuss, the double-recovery issue which

12  may preclude the District from recovering its claimed recharge costs to the extent those costs have

13  already been passed on to and paid by the District's customers. Specifically, 42 U.S.C. § 9614(b)

14  provides that any person who receives compensation for removal costs or damages pursuant to any

15  Federal or State law is precluded from receiving compensation for the same removal costs or damages.

16  The provision essentially prohibits double-recovery and a party who has already received

17  compensation for its incurred costs of removal cannot recover those same costs again. *See Basic*

18  *Management Inc. v. United States*, 569 F. Supp. 2d 1106, 1122-25 (D. Nev. 2008); *Vine Street LLC v.*

19  *Keeling*, 460 F. Supp. 2d 728, 764-66 (E.D. Tex. 2006); *Carson Harbor Village Ltd. v. Unocal Corp.*,

20  287 F. Supp. 2d 1118, 1181-82 (C.D. Cal. 2003) (addressing whether increased rent authorization

21  could bar recovery because it was awarded in part to compensate for recovery costs, but finding that

22  rental increase was not approved solely to compensate for remediation expenses), *aff'd* 433 F.3d 1260

23  (9th Cir. 2006). Accordingly, the District is precluded from recovering recharge costs to the extent

24  that it has already passed such costs on to, and received payment from, its customers.

25      There appear to be genuine issues of material fact regarding the extent to which the District has

26  passed its recharge costs on to its customers, however, and at oral argument, the District contended

27  that it has been operating at a deficit and has not been receiving enough revenue to cover its recharge

28  costs. Thus, summary adjudication cannot be granted to preclude recovery of all recharge costs on the

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

1  basis that recovery would necessarily result in a double recovery.  However, as discussed below, the

2  District cannot recover its recharge costs because they do not constitute "response costs."

3         **3.**       **Recovery of Recharge Costs under CERCLA**

4            **a.**       **Recharging Performed for Reasons Unrelated to Perchlorate
                    Contamination**

5

6        Olin also seeks summary adjudication that the District cannot recover its claimed recharge

7  costs under CERCLA for two additional reasons: (1) the recharge costs were not caused by any release

8  of perchlorate attributable to Olin, and (2) the District cannot demonstrate that it incurred recharge

9  costs consistent with the national contingency plan.  The undisputed evidence establishes that the

10  District has done the same recharging and incurred the costs thereof for years, commencing before the

11  perchlorate contamination was discovered, and has done so independently of any response to

12  contamination.

13            **b.**       **Causation**

14        The parties disagree over the extent to which costs may be recoverable under CERCLA in

15  private party actions.  Olin contends that the District cannot recover its claimed recharge costs because

16  no such costs were caused by any release of perchlorate attributable to Olin and that the District

17  engaged in its recharge activities for reasons completely unrelated to the presence of perchlorate in the

18  subbasin.  Olin cites several Ninth Circuit decisions that, in reciting the elements of a *prima facie* case

19  under Section 42 U.S.C. § 9607(a), have noted that a claimant must establish that a "'release' or

20  'threatened release' has caused the plaintiff to incur response costs that were 'necessary' and 'consistent

21  with' the national contingency plan."  *See e.g.*, *3550 Stevens Creek Assocs. v. Barclays Bank of Calif.*,

22  915 F.2d 1355 (9th Cir. 1990); *Carson Harbor Village Ltd. v. Unocal Corp.*, 270 F.3d 863, 870-71

23  (9th Cir. 2001) (en banc) (*Carson Harbor I*).

24        The District contends that CERCLA allows recovery of response costs if there is a

25  release of hazardous material and response costs are incurred and that the statute requires no causal

26  relationship.  A causal relationship is only required when there is merely a threatened, as opposed to

27  an actual, release which causes the incurrence of response costs.  The District bases its position on the

28  language of the statute that reads "from which there is a release, or a threatened release which causes

**United States District Court**
For the Northern District of California

the incurrence of response costs, of a hazardous substance...."  In particular, the District maintains that the placement of the comma after "release" and the lack of a comma after "threatened release" means that the "causes" limitation only modifies the phrase "threatened release" and thus there is no causation requirement when there has been an actual release.  *See Louisiana-Pacific Corp. v. Beazer Materials & Services, Inc.*, 811 F. Supp. 1421, 1427-30 (E.D.Cal.,1993); *City of New York v. Exxon Corp.*, 766 F. Supp. 177, 193 (S.D.N.Y. 1991) ("[T]he better reading of this phrase is that only a threatened release must cause response costs."); *Ariz. v. Motorola, Inc.*, 805 F. Supp. 742, 746 (D. Ariz. 1992); *Westfarm Assocs. Ltd. P'ship v. Int'l Fabricare Inst.*, 846 F. Supp. 422, 432 (D. Md. 1993) ("Only in case of a threatened release does it appear that a plaintiff must demonstrate any degree of causation."). Therefore, in this case, since there was an actual release of perchlorate, the District maintains that all it must show is the release of perchlorate and that the costs of response were "consistent with the national contingency plan."  42 U.S.C. § 9607(a)(4).

Case law on the causation issue is not uniform.  For example, the court in *Town of Wallkill v. Tesa Tape, Inc.*, 891 F. Supp. 955 (S.D.N.Y. 1995), held that the costs of a landfill closure were recoverable under CERCLA even though they would have been incurred regardless of release; the release need not cause all response costs, but to be recoverable the costs of response must be necessary and consistent with the national contingency plan.  *See also West County Landfill, Inc. v. Raychem Int'l Corp.*, 1995 U.S. Dist. LEXIS 20692 at **9-20. (N.D. Cal. Nov. 9, 1995)(same). Others hold that such costs are not recoverable.  *See Barnes Landrill, Inc. v. Town of Highland*, 802 F. Supp. 1087 (S.D.N.Y. 1992) (denying recovery of ordinary landfill closing costs, noting that "It is only costs caused by the hazardous substance response for which defendants can be held liable under federal law. Ordinary closing or clean-up costs not pertaining to hazardous substances, incurred under state law or otherwise, would not be a basis for holding defendants responsible under CERCLA.").

Cases within the Ninth Circuit support the conclusion that a CERCLA *prima facie* case requires a plaintiff to show that a release caused the incurrence of some response costs but it does not require that the release cause all of the recoverable response costs.  In *Carson Harbor Village, Ltd. v. Unocal*, 287 F.Supp.2d 1118, 1186 (C.D. Cal 2003), the court held that the plaintiff must establish a causal link between the release for which defendant is responsible and the response costs incurred.

1  "The nexus that must be shown, however, is a loose one.  In the case of an actual release, the plaintiff

2  need only prove that the defendant's hazardous materials were deposited at the site, that there was a

3  release at the site, and that the release caused it to incur response costs. It need not show that

4  defendant's waste was the source of the release or that defendant's waste caused it to incur response

5  costs."  *Id.*  In *Carson Harbor I*, 270 F.3d at 863, after reciting the elements for proving liability

6  under CERCLA, the court pointed out that the subjective business motivation of the responding party

7  is not relevant; the focus is on whether the response action is addressed to a threat to human health or

8  the environment.  Therefore, the court reversed a district court's grant of summary judgment in favor

9  defendants because the district court had improperly followed the "ulterior motive" theory, which

10  would preclude recovery of cleanup costs as "unnecessary" if the cleanup activities were undertaken

11  for reasons other than because of an actual and real public health threat.  *Id.* at 871-72.  It did not

12  matter whether the party had a business motive or other motivation for cleaning up the property, and

13  instead the focus of the inquiry was on whether there was a threat to human health or the environment

14  and whether the response action is addressed to that threat. *Id.* at 872.  Thus, under *Carson Harbor I*,

15  the fact that the District had reasons for engaging in its recharge activities other than cleaning up the

16  perchlorate does not, in and of itself, preclude recovery of the recharge costs.

17       The District must show only a nexus between the response costs (only a portion of which are

18  recharge costs) and the release of perchlorate to be entitled to "necessary costs of response."  This

19  conclusion is consistent with the statute itself which provides in relevant part:

20
21       Notwithstanding any other provision or rule of law, and subject only to the defenses set
         forth in subsection (b) of this section–

22            (1) the owner and operator of a vessel or a facility,

23            (2) any person who at the time of disposal of any hazardous substance owned
         or operated any facility at which such hazardous substances were disposed of,

24
25            (3) any person who by contract, agreement, or otherwise arranged for disposal
         or treatment, or arranged with a transporter for transport for disposal or treatment, of
         hazardous substances owned or possessed by such person, by any other party or
26       entity, at any facility or incineration vessel owned or operated by another party or
         entity and containing such hazardous substances, and

27
28            (4) any person who accepts or accepted any hazardous substances for
         transport to disposal or treatment facilities, incineration vessels or sites selected by

United States District Court
For the Northern District of California

such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for–

**(A)** all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan;

**(B)** any other <u>necessary costs of response incurred by any other person consistent with the national contingency plan</u>;

**(C)** damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release; and

**(D)** the costs of any health assessment or health effects study carried out under section 9604(i) of this title.

42 U.S.C. §9607(a) (emphasis added).

Courts have generally recognized that § 9607(a) (1)-(4) identifies the categories of potentially responsible parties who are liable for the costs incurred in remediating hazardous waste and that subsections (A) through (D) identify the extent of their liability.  In the case of private party cost recovery actions, the potentially responsible persons are liable for "any other necessary costs of response incurred by any other person consistent with the national contingency plan."  42 U.S.C. §9607(a)(4)(B).  Thus, in order to be recoverable, the claimed cost must be: 1) a "cost of response;" 2) "necessary;" and 3) incurred consistent with the national contingency plan.

### c.    Cost of Response

The statute does not define "response cost," "cost of response," or "necessary."  It does, however, define "response" to include "remove, removal, remedy, and remedial action," and also provides extensive complex definitions of "remove" and "remedy."  42 U.S.C. §9601(23-25).[4]  As

---

[4] "Remove" is defined as follows: "The terms "remove" or "removal" means the cleanup or removal of released hazardous substances from the environment, such actions as may be necessary taken in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release. The term includes, in addition, without being limited to, security fencing or other measures to limit access, provision of alternative water supplies, temporary evacuation and housing of threatened individuals not otherwise provided for, action taken under section 9604(b) of this title, and any emergency assistance which may be provided under the Disaster Relief and Emergency Assistance Act [42 U.S.C.A. 5121 et seq.]." 42 U.S.C. §9601(23).

**United States District Court**
For the Northern District of California

United States District Court
For the Northern District of California

1    summarized by one district court, "response costs" are "costs incurred in relation to assessing,

2    monitoring, cleaning, and removing released hazardous substances, minimizing damage to the public

3    health or environment from the hazardous substances, and achieving a permanent remedy. *See* 42

4    U.S.C. § 9601(23)-(25) (defining 'response,' 'remove,' 'remedy,' and 'removal action')." *Basic*

5    *Management Inc. v. United States*, 569 F. Supp. 2d 1106, 1120 (D. Nev. 2008).  Under this definition,

6    the District's recharge activities are not a "cost of response" because they were not "incurred in

7    relation to assessing, monitoring, cleaning, and removing released hazardous substances, minimizing

8    damage to the public health or environment from the hazardous substances, and achieving a permanent

9    remedy."

10           The District's recharge activities have been and continue to be a standard practice engaged in

11   by the District to fulfill its obligation to maintain the Llagas subbasin and provide a sufficient water

12   supply for its customers.  The recharging activities were not undertaken for the purpose of removing,

13   or assisting in the removal of, perchlorate.  In other words, the recharge costs have not been incurred

14   "in relation to" removing released hazardous substances.  The District's recharge activities in

15   conjunction with natural recharge through rainfall and streams, the pumping of groundwater from

16   wells by users, and the infiltration of irrigation, as well as the active remediation efforts within the

17   plume core, are all contributing to the dilution of perchlorate concentrations in areas outside the plume

18   _____

19   "Remedy" is defined as follows:  "The terms "remedy" or "remedial action" means  those actions
     consistent with permanent remedy taken instead of or in addition to removal actions in the event of a

20   release or threatened release of a hazardous substance into the environment, to prevent or minimize
     the release of hazardous substances so that they do not migrate to cause substantial danger to present

21   or future public health or welfare or the environment. The term includes, but is not limited to, such
     actions at the location of the release as storage, confinement, perimeter protection using dikes,

22   trenches, or ditches, clay cover, neutralization, cleanup of released hazardous substances and
     associated contaminated materials, recycling or reuse, diversion, destruction, segregation of reactive

23   wastes, dredging or excavations, repair or replacement of leaking containers, collection of leachate
     and runoff, onsite treatment or incineration, provision of alternative water supplies, and any

24   monitoring reasonably required to assure that such actions protect the public health and welfare and
     the environment. The term includes the costs of permanent relocation of residents and businesses

25   and community facilities where the President determines that, alone or in combination with other
     measures, such relocation is more cost-effective than and environmentally preferable to the

26   transportation, storage, treatment, destruction, or secure disposition offsite of hazardous substances,
     or may otherwise be necessary to protect the public health or welfare; the term includes offsite

27   transport and offsite storage, treatment, destruction, or secure disposition of hazardous substances
     and associated contaminated materials." 42 U.S.C. §9601(24)

28

ORDER GRANTING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFF'S COST RECOVERY
CLAIM AND CERTAIN DAMAGES SOUGHT ON ITS NEGLIGENCE CAUSE OF ACTION—No. C-07-03756 RMW
TER                                                                   13

**United States District Court**
For the Northern District of California

1 core.  Simply stated, the recharge activities were not initiated or have they been maintained as a

2 "response" to the perchlorate contamination, and thus the recharge costs are not "costs of response."

3 Accordingly, the recharge costs may not be recovered under CERCLA.

4      To put this matter into its larger context, the "response action" under the monitored attenuation

5 proposed by Olin and ordered by the Water Board is <u>monitoring</u> the perchlorate concentrations in the

6 groundwater.  Monitored attenuation differs from "no further action" only in that it requires ongoing

7 monitoring.  In other words, monitored attenuation is allowing matters to proceed as usual – rain will

8 fall, wells will continue to pump water, irrigation will continue to infiltrate, and the District will

9 continue to maintain the water supply – and as the active remediation continues to remove perchlorate

10 from the plume core, it is anticipated that the perchlorate concentrations outside the plume core will

11 continue to decrease.

12      Thus, the District's recharge program, and its corresponding costs, were not "incurred in

13 relation to assessing, monitoring, cleaning, and removing released hazardous substances, minimizing

14 damage to the public health or environment from the hazardous substances, and achieving a permanent

15 remedy."  To the contrary, the recharge activities are related to the removal of perchlorate in only the

16 most attenuated of senses – the Regional Water Quality Control Board's Cleanup Abatement Order has

17 approved "monitored attenuation" for a portion of the subbasin outside the plume core in which Olin is

18 required to monitor the levels of perchlorate and in which the collective involvement of the District's

19 artificial recharge activities, the natural recharge of the basin through rainfall, the pumping of

20 groundwater from wells by users, and the infiltration of irrigation, all collectively have the effect of

21 further diluting the perchlorate levels outside the plume core.  The District's recharge activities are no

22 more a response to the perchlorate contamination than is the pumping of water from the wells,

23 irrigation, and rainfall.

24      In summary, the District cannot demonstrate that its recharge actions are a "response" to the

25 presence of the perchlorate contamination.  If the activity is not a response action, then its cost cannot

26 be a "cost of response" recoverable under CERCLA.  *See City of Moses Lake v. United States*, 458 F.

27 Supp. 2d 1198, 1218-1221 (E.D. Wash. 2006) (holding that certain claimed costs of response were not

28

ORDER GRANTING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFF'S COST RECOVERY
CLAIM AND CERTAIN DAMAGES SOUGHT ON ITS NEGLIGENCE CAUSE OF ACTION—No. C-07-03756 RMW
TER
14

1  recoverable because they were not "necessary" and were not undertaken "in response" to the

2  contamination).  Thus, partial summary judgment in favor of defendant is appropriate.

3              **d.      Necessary**

4       Additionally, as noted above, in order for a "response cost" to be recoverable, it must also be a

5  "necessary" response cost.  The Ninth Circuit sitting e*n banc* has addressed the "necessary" prong,

6  explaining:

> Remediation costs are recoverable under CERCLA only if "necessary."  It is
> generally agreed that this standard requires an actual and real threat to human health
> or the environment exist before initiating a response action....  In determining
> whether response costs are "necessary," we focus not on whether a party has a
> business or other motive in cleaning up the property, but on whether there is a threat
> to human health or the environment and <u>whether the response action is addressed to
> that threat</u>.

11  *Carson Harbor Village, Ltd. v. Unocal Corp.*, 270 F.3d 863, 871-72 (9th Cir. 2001) (emphasis

12  added).  Under this prong, too, the District's claimed recharge costs are not recoverable because the

13  claimed "response action" was not "addressed to the threat" of perchlorate contamination in the

14  subbasin.

15       The District, however, argues that the response costs were necessary.  Specifically, the District

16  asserts that substantial evidence shows that the release of perchlorate resulted in a threat to human

17  health and the environment, pointing to the Water Board's Cleanup Abatement Order.  Berka Decl. Ex

18  I.  It further argues that "the recharge activities by the District address the threat by, as Olin

19  acknowledges, diluting and dispersing the contamination, providing an 'essential component' of the

20  cleanup."  Opp. at 17-18, citing primarily to the 2006 Revised Llagas Subbasin Cleanup Feasibility

21  Study at 3-15 and the 2007 Cleanup Abatement Order at ¶26(D).   Here, however, the District's

22  argument stretches beyond a reasonable interpretation of the evidence.  In context, the Study states:

> The primary attenuation processes that control perchlorate concentrations at
> shallower depth intervals are dilution from recharge and dispersion through the
> porous medium of the shallow, intermediate, and deep aquifers.  <u>Recharge in the
> Llagas Subbasin includes infiltration from seasonal rainfall and from streams
> throughout the valley</u>, particularly the Little Llagas and Llagas creeks, <u>but also
> infiltration from percolation ponds owned and operated by the SCVWD</u>....  The
> amount of infiltration from the [percolation ponds] represents a significant
> anthropogenic source of water not native to the Llagas Subbasin that distinguishes
> attenuation process from "monitored natural attenuation" processes that are
> commonly referenced ....
>           *        *        *

United States District Court
For the Northern District of California

1
2
3
4
5
6

> Groundwater within the intermediate aquifer in this area consists of approximately 40 to 60 percent imported water ... and the additional source of water from the percolation ponds thus results in a reduction in perchlorate concentration.  An associated reduction in perchlorate mass does not result solely from the additional source of water, rather heterogeneous conditions and time-variable pumping patterns have provided a mixing mechanism that effectively lengthens the cross-sectional area with perchlorate.  <u>Heterogeneity and pumping thus increase dispersion in the Llagas Subbasin that, when combined with additional water from the percolation ponds, provide an essential component to attenuating perchlorate concentrations</u> and reducing the mass flux between Area I and Areas II and III as a form of dilution by anthropogenic recharge.

7   Revised Llagas Subbasin Cleanup Feasibility Study, pp. 3-14 to 3-15 (Berka Dec., Ex. M)(emphasis

8   added).

9       Thus, "recharge," as used in the Study, includes both natural recharge from rainfall and

10  streams as well as artificial recharge provided by the District's importation of water from the

11  percolation ponds.  Moreover, in context, the Study states that recharge (artificial and natural), plus

12  "heterogeneous conditions" and "time-variable pumping patterns," together provide "an essential

13  element to attenuating perchlorate concentrations."  It is not a fair characterization of the Study to

14  describe it as a statement that the District's recharge program is providing an "essential component to

15  the cleanup."  Moreover, the proposed monitored attenuation was described as follows:

16
17
18

> This alternative consists of routine groundwater monitoring activities to establish and confirm trends in declining perchlorate concentrations over time due to attenuation processes.  The main monitored attenuation processes at Priority Zone B would consist of:

19
20

> 1.   Reduction in mass in the source area due to ongoing remedial actions onsite and throughout the Subbasin, as well as proposed remedial actions in Priority Zone A.

21

> 2.   Dilution and infiltration to the shallow aquifer due to percolation of precipitation.

22
23

> 3.   Dilution/mixing due to imported water from the SCVWD's recharge ponds.

24
25

> 4.   Continued irrigation with water from intermediate aquifer, coupled with reduction of perchlorate in intermediate aquifer (due to the reduced flux noted above) will result in a reduction fo shallow aquifer concentrations.

26

> 5.   Reduction in mass due to continued extraction from existing municipal and private supply wells.

27  2006 Revised Llagas Subbasin Cleanup Feasiblity Study, pp. 7-6 to 7-7, Berka Dec. Ex. M.

28

ORDER GRANTING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFF'S COST RECOVERY CLAIM AND CERTAIN DAMAGES SOUGHT ON ITS NEGLIGENCE CAUSE OF ACTION—No. C-07-03756 RMW
TER
16

**United States District Court**
For the Northern District of California

1   Thus, the District's recharge program is but one component of a myriad of other factors,

2   including natural recharge provided by rainfall, continued pumping of water from wells by water

3   users, and irrigation, in addition to the active remediation in the areas of higher perchlorate

4   concentration, that collectively are expected to further dilute the perchlorate in the zones of lower

5   concentration.

6   It is undisputed that the District's recharge program was not undertaken for the purpose of

7   assisting in the remediation of perchlorate from the subbasin, nor was the presence of perchlorate

8   considered when the District made its decision to undertake recharge activities.

9   The Study and Cleanup Abatement Order do not provide a sufficient evidentiary basis upon

10  which a reasonable trier of fact could find in the District's favor that the District's recharge program

11  was a "necessary cost of response" that are recoverable under CERCLA.  Accordingly, partial

12  summary judgment in favor of defendant is appropriate.

13          **e.      Consistent with National Contingency Plan**

14  Finally, Olin argues that the District's recharge costs are not recoverable under CERCLA

15  because the District cannot establish that the costs incurred were consistent with the National

16  Contingency Plan.  In light of the fact that the court has concluded that the District's recharge costs are

17  not "necessary costs of response" under CERCLA, the court does not reach the question of whether

18  the recharge costs are "consistent with the national contingency plan."

19      **C.    Summary Judgment on Plaintiff's Negligence Claim**

20          **1.      Nature of Negligence Claim**

21  Olin also seeks summary judgment on the District's sixth cause of action for negligence.  The

22  negligence claim was asserted in the First Amended Complaint in the place of the previous claim for

23  equitable indemnity that had been dismissed.  Like the prior claim for equitable indemnity, the

24  negligence claim seeks to recover as damages the costs and attorney's fees the District incurred in

25  defending itself against third party actions.  FAC ¶¶64-65.  The District alleges that:

26          By using, storing, disposing of, and arranging for the disposal of pollutants and
            contaminants at and in the vicinity of the Site, Olin caused damage and harm as alleged

27          herein and created conditions that were in violation of the law and applicable rules and
            regulations.  Olin's improper and negligent management of pollutants and contaminants

28

1

created a duty to abate the hazardous conditions created by such conduct. Olin has failed, however, to abate fully said conditions.

2

FAC ¶63.

3

Olin seeks summary judgment on the negligence claim, contending that it owed no duty of care to the District. Olin additionally requests summary adjudication on two elements of the District's claimed damages, specifically, the recharge costs and the legal fees and expenses incurred in third party litigation which it seeks to recover under the "tort of another" doctrine.

4

5

6

7

### 2. Absence of Duty

8

Olin contends that the negligence claim fails because it owed no duty to the District, specifically that there is no preexisting common law duty requiring it to affirmatively act to abate hazardous conditions. Motion at 15, citing *Stout v. City of Porterville,* 148 Cal.App.3d 937, 947 (1983). The District, in turn, identifies Cal. Civ. Code § 1714 as the source of a statutory duty owed by Olin: everyone is responsible for an injury occasioned to another by his want of ordinary care or skill in the management of his property. The District argues that Olin was negligent in managing its property – specifically allowing the perchlorate to escape from its premises – and this caused the injuries the District incurred. The District argues:

9

10

11

12

13

14

15

16

Here, the perchlorate at issue is Olin's property. Olin dumped the perchlorate into the ground, which made its way into the groundwater, and Olin's property continues to exist in the groundwater throughout the Llagas Subbasin today. The presence of Olin's perchlorate and untimely abatement caused injury to the District. The District uses the groundwater from the Llagas Subbasin to supply water to the public; the presence of Olin's property there interferes with the District's ability to do that. Moreover, Olin's failure to timely abate or remove perchlorate from the groundwater caused the District to undertake efforts to respond. Among other things, the District was required to sample water wells and provide replacement bottled water to residents and businesses whose wells were threatened or affected by the presence of Olin's toxic materials. As a result of Olin's conduct, the District suffered significant economic loss.

17

18

19

20

21

22

Opp. at 12 (record cites omitted). The District does not contest Olin's claim that it cannot recover its claimed "recharge costs" under its negligence claim because it cannot establish causation.

23

24

Olin does not respond to the District's argument with regard to the duty imposed under Cal. Civ. Code § 1714, and instead focuses on the District's claimed damages, arguing that they are not recoverable in negligence. Thus, summary judgment on the negligence claim essentially reduces to whether or not the District may recover its claimed damages under its negligence cause of action.

25

26

27

28

1

2

3       **3.**      **Damages**

4            **a.**      **Recharge Costs**

5      The District's recharge activities were not proximately caused by the release of perchlorate,

6 nor did they result from any of Olin's alleged negligent acts.  Accordingly, the District cannot recover

7 as damages for negligence the nearly $30 million sought in "recharge costs."

8            **b.**      **"Tort of Another" Damages**

9      Under the "tort of another" doctrine, "[a] person who through the tort of another has been

10 required to act in the protection of his interests by bringing or defending an action against a third

11 person is entitled to recover compensation for the reasonably necessary loss of time, attorney's fees,

12 and other expenditures thereby suffered or incurred."  *Prentice v. North Am. Title Guaranty Co.*,  59

13 Cal.2d 618, 620 (1963).  The doctrine permits a party to recover the attorney's fees which the party

14 incurred in other litigation, where such fees and legal expenses are a part of the damages resulting

15 from a tort committed against that party.  The damages arising from the "tort of another" are the legal

16 expenses incurred by the claimant in litigation with a third party that results from the tortfeasor's

17 harm to the claimant.  Under the doctrine, if the legal expenses that the District incurred in defending

18 against litigation brought by third parties was proximately caused by Olin's negligence, then those

19 legal expenses are recoverable as damages.

20      Olin notes that in the underlying third party litigation against the District, the District was

21 sued for the District's own alleged negligence and wrongdoing.  RJN Exh 2.  The District does not

22 deny that it was defending itself from claims of its own wrongdoing.  Under *Davis v. Air Technical*

23 *Industries, Inc.*, 22 Cal.3d 1, 7 (1977), the "tort of another" doctrine of damages recognized in

24 *Prentice* does not extend to allow recovery of legal expenses by a defendant who was defending

25 against allegations of its own negligence.  That situation is presented here: the District cannot recover

26 from Olin, as damages under its negligence claim, the legal expenses which it incurred in third party

27 litigation where the litigants were suing the District for the District's own negligent acts.

28            **c.**      **Other Damages**

ORDER GRANTING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFF'S COST RECOVERY
CLAIM AND CERTAIN DAMAGES SOUGHT ON ITS NEGLIGENCE CAUSE OF ACTION—No. C-07-03756 RMW
TER

1    In its opposition memorandum and at the hearing, the District identified a number of other

2  elements comprising its damages claim which it seeks to recover under its negligence cause of action,

3  including the costs incurred in providing bottled water, water sampling, public notification, the public

4  hotline, the 800 telephone number, the technical support given to Olin that was incorporated into the

5  clean up, the treatment system for the City of Morgan Hill well, the analysis of Olin's clean up plans

6  and the time and resources spent preparing comments.

7    The parties' briefs only cursorily discuss the issues of: (1) whether the other damages sought

8  by the District on its negligence cause of action are only economic loss damages; (2) whether

9  economic loss damages can only be recovered on a negligence theory if the parties have a special

10 relationship; and (3) whether a special relationship existed between the District and Olin.  The court

11 is not prepared to grant summary judgment in favor of Olin without further briefing on these issues.

12 Accordingly, summary adjudication is denied without prejudice on the District's negligence claim for

13 damages other than recharge costs and attorney's fees and costs under the "tort of another" doctrine.

14    **D.    Recharge Cost Recovery Under Health and Safety Code Section 25363(e)**

15    The parties both agree that Olin's liability under Section 25363(e) of the Health and Safety

16 Code is directly contingent on its liability under CERCLA.  In this case, because the District's claim

17 for recharge costs under CERCLA fails, so too does its claim for such costs under Section 25363(e).

18 Accordingly, defendant is entitled to partial summary judgment on the District's claimed recharge

19 costs under California Health and Safety Code Section 25363(e).

20    **E.    Recharge Cost Recovery under California Water Code Section 13304**

21    Water Code Section 13304(c)(1) provides in relevant part that "[i]f the waste is cleaned up or

22 the effects of the waste are abated, or, in the case of threatened pollution or nuisance, other necessary

23 remedial action is taken by any governmental agency, the person or persons who discharged the

24 waste ... are liable to that governmental agency to the extent of the reasonable costs actually incurred

25 in cleaning up the waste, abating the effects of the waste, supervising cleanup or abatement activities,

26 or taking other remedial action."  Olin seeks summary judgment that the District cannot recover its

27 recharge costs under its Water Code claim because the District cannot establish causation.  Olin

28 argues that California courts have recognized that Section 13304 must be construed in light of

common law nuisance, which requires a showing of causation, even though the statute itself is silent with regard to causation. *City of Modesto Redevelopment Agency v. Superior Court*, 119 Cal. App. 4th 28, 37-38 (2004) (recognizing the appropriateness of construing section 13304 in light of the common law principles bearing on nuisance); *Portman v. Clementina Co.*, 147 Cal. App. 2d 651, 656 (1957) (recognizing causation as element of nuisance claim); BAJI 8.60 (elements of nuisance include causation of damages).

The District argues in opposition that the statutory language itself does not require causation and that there is no case law requiring a governmental agency to prove what caused it to take action in order to recover under Section 13304.

The court is persuaded by defendant's arguments. Section 13304 is to be read in light of the common law principles of nuisance and these principles include a causation requirement. There is no evidence that the release of perchlorate caused the District to undertake its recharge activities. To the contrary, the evidence is undisputed that the recharge activities were not caused by the perchlorate release. Accordingly, the District's recharge costs are not recoverable under Water Code Section 13304, and defendant's motion for partial summary judgment is granted.

**F.     Recovery of Recharge Costs under Common Law Restitution for Unjust Enrichment**

Olin asserts five separate arguments in support of partial summary judgment that the District cannot recover its recharge costs under its claim for restitution. The court will address those that it finds meritorious.

Olin first challenges the District's assertion that it is entitled to restitution because it conferred a benefit on Olin, the cost of which Olin would otherwise have been required to bear. Olin argues that "[t]hough Olin had an obligation to remove perchlorate contamination from the Llagas Sub-basin, it had no obligation and was not *required* to do so through recharge activities." Motion at 22-23. While true, Olin's argument misses the point. As the District argues in opposition, the arguable benefit to Olin was saving the cost of active remediation that it could have been required to bear. The District argues that it "is entitled to restitution because it conferred a benefit on Olin by recharging the Llagas Subbasin, the cost of which Olin otherwise would have been required to incur. Under the

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1  law of restitution, a benefit is conferred not only when one adds to the property of another, but *also*

2  *when one saves the other from expense or loss.*"  Opp. at 21, citing Restatement of Restitution §1

3  cmt. b, *Ghirardo v. Antonioli*, 14 Cal.4th 39, 51 (1996).  More specifically, the District notes that

4  "[t]he District saved Olin from the expense of active remediation of the Llagas Subbasin – estimated

5  by its consultants to amount to over $295 million."  Opp. at 21, citing Berka Dec. Ex M. at xvi and 4-

6  8.

7          The District, however, overstates the evidence.  Although the Study states that active

8  remediation in the zone ultimately approved for monitored attenuation could cost $295 million, the

9  Study also notes that active remediation in this zone would induce other undesirable adverse effects

10  to the subbasin, such as local dewatering, pumping and well interference, and induced groundwater

11  quality degradation. Study at 4-8, 7-9 to 7-10.  It bears repeating here that the monitored attenuation

12  approach relied on a myriad of factors in addition to the artificial recharge provided by the District.

13  Significantly, the District has not pointed to any evidence in the record to establish that the Water

14  Board would have required Olin to engage in active remediation absent the District's recharge

15  program.  Based on the present record, no reasonable trier of fact could find that Olin was unjustly

16  enriched by the more than $29 million that the District seeks to recover as recharge cost damages, and

17  the Study, standing alone, is insufficient evidence upon which a reasonable trier of fact could find in

18  favor of the District on its restitution claim.  In opposing summary judgment, the District had the

19  burden of pointing to sufficient evidence in the record from which a reasonable trier of fact could find

20  in its favor on the restitution claim.  The District has failed to carry this burden.

21          Olin also argues that any benefit conferred on it by the District was "merely incidental to the

22  performance of its own independent obligation to recharge the Llagas Sub-basin, and therefore cannot

23  constitute grounds on which Olin may base its claim for restitution."  Motion at 23, citing

24  Restatement of Restitution §106, *Allegheny General Hospital v. Philp Morris, Inc.*, 228 F.3d 429,

25  447 (3d Cir. 2000); *Major-Blakeney Corp. v. Jenkins*, 121 Cal.App.2d 325, 3410-41 (1985).  It

26  further argues that "[t]he District is obligated by statute to ensure adequate water supply, and

27  recharge activities are explicitly identified in the California Water Code as an encouraged method of

28  carrying out the District's duties.... Thus, the District cannot successfully claim restitution for costs

ORDER GRANTING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFF'S COST RECOVERY
CLAIM AND CERTAIN DAMAGES SOUGHT ON ITS NEGLIGENCE CAUSE OF ACTION—No. C-07-03756 RMW
TER

United States District Court
For the Northern District of California

1 expended in the course of discharging its statutorily-created duty, regardless of any incidental benefit
2 its activities may have created for Olin." *Id*

3       In opposition, the District contends that the authorities cited by Olin are inapposite because
4 the District does not have a statutory duty to cleanup the perchlorate and is not statutorily required to
5 recharge. Here, however, it is the District's arguments that are misdirected. The issue is not whether
6 the District has an obligation to clean up the perchlorate but rather whether the District has the duty
7 to maintain the water supply in the subbasin, which it does. The District chooses to perform its duty
8 through its recharge program. The authorities cited by Olin are thus on-point and the District cannot
9 recover from Olin the cost of the District's recharge program under a theory of restitution for unjust
10 enrichment.

11       To prevail on a claim of restitution for unjust enrichment, the District must establish that Olin
12 was unjustly enriched at the District's expense. "An individual is required to make restitution if he or
13 she is unjustly enriched at the expense of another. A person is enriched if the person receives a
14 benefit at another's expense. Benefit means any type of advantage. The fact that one person benefits
15 another is not, by itself, sufficient to require restitution. The person receiving the benefit is required
16 to make restitution only if the circumstances are such that, as between the two individuals, it is *unjust*
17 for the person to retain it." *Fist Nationwide Savings v. Perry*, 11 Cal.App.4th 1657 1662-63 (1992)
18 (citations omitted). The District has failed to meet its burden in opposing summary judgment to
19 identify sufficient evidence in the record pursuant to which a reasonable trier of fact could find it its
20 favor on this claim.

21     **G.**    **Cost Recovery under Declaratory Relief Causes of Action**

22       Finally, Olin seeks partial summary judgment on the District's declaratory relief causes of
23 action to the extent that the District seeks a declaration of Olin's liability to the District for the
24 District's future recharge costs. Because the District makes no showing that any change will have to
25 be made in its recharge activities as a result of the perchlorate contamination, there is no basis upon
26 which the court can declare that Olin will be responsible for future recharge costs.

27
28

ORDER GRANTING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFF'S COST RECOVERY
CLAIM AND CERTAIN DAMAGES SOUGHT ON ITS NEGLIGENCE CAUSE OF ACTION—No. C-07-03756 RMW
TER

## III.  ORDER

For the foregoing reasons, summary judgment is granted in favor of defendant on plaintiff's claim for recharge costs on all causes of action and for attorney's fees and costs on plaintiff's tort of another theory on its negligence claim.  The motion is otherwise denied without prejudice on plaintiff's negligence claim.

DATED:      8/19/09

*Ronald M Whyte*

RONALD M. WHYTE
United States District Judge

ORDER GRANTING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFF'S COST RECOVERY CLAIM AND CERTAIN DAMAGES SOUGHT ON ITS NEGLIGENCE CAUSE OF ACTION—No. C-07-03756 RMW
TER

24

**Notice of this document has been electronically sent to:**

**Counsel for Plaintiff:**

| | |
|---|---|
| Christopher Berka | chris.berka@bingham.com |
| Greg Alan Christianson | greg.christianson@bingham.com |
| Emily Jane Leahy | emily.leahy@bingham.com |
| Holly Louise Pearson | holly.pearson@bingham.com |

**Counsel for Defendant:**

| | |
|---|---|
| Randall C. Creech | Rcreech@sjlegal.com |
| Michael Eric Molland | mmolland@morganlewis.com |
| Aaron Scott Dutra | asdutra@morganlewis.com |
| Benjamin Patrick Smith | bpsmith@morganlewis.com |

Counsel are responsible for distributing copies of this document to co-counsel that have not registered for e-filing under the court's CM/ECF program.

**Dated:** ___8/19/09_____          _____TER_____

                                                    **Chambers of Judge Whyte**

ORDER GRANTING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFF'S COST RECOVERY CLAIM AND CERTAIN DAMAGES SOUGHT ON ITS NEGLIGENCE CAUSE OF ACTION—No. C-07-03756 RMW
TER                                                    25

*United States District Court*
*For the Northern District of California*